Opinion
SIMS, J.
Placer County is named after a technique of mining for gold—placer mining—that was used extensively in the Sierra foothills *1090 after the discovery of gold in California and until the early years of the 20th century.[1] Placer mining is basically a process by which miners build dams, divert waters through flumes or ditches, channel the waters into huge pipes and, ultimately, into nozzles large enough to make one believe that Gulliver himself might have used one to water his garden. When these giant nozzles are trained on gold bearing soil, the water discharged from the monitor washes the soil away, and the runoff mixture of soil and water is run through sluice boxes, where the heavier gold bearing ore settles to the bottom, and is caught by small ridges in the bottom of the sluice boxes.
During the second half óf the 19th century, this process of placer mining resulted simultaneously in the extraction of millions of dollars of gold and the devastation of thousands of acres of land in the Sierra foothills. Even now, more than a century later, the effects of this mining process can be seen at many locations in Placer County where small, straggling pines dot a moon-like landscape in areas that are euphemistically referred to as “the diggin’s.”
Large scale placer mining in the Sierra foothills shut down in the early part of the 20th century. The technique was not discontinued because anyone was concerned about the devastation of the foothills. Nor was the process abandoned because it became too expensive (it remains the most economical method of mining for gold). Nor did the mother lode run out of gold. Rather, placer mining stopped because mud and silt produced by the mines began to fill up the great rivers of Northern California and the agricultural irrigation systems that depended on those rivers. The courts stopped large-scale placer mining by upholding injunctions against mining operations that were obtained by residents of the Sacramento Valley. The theory of injunctive relief was nothing other than good old common law nuisance. (See, e.g., County of Sutter v. Nicols (1908) 152 Cal. 688, 691 [93 P. 872].)
The instant case arose about a century after the heyday of placer mining in Placer County. But the case represents another chapter in the ongoing conflict between placer miners and those who object to the mud and silt generated by placer mining. Here is what happened:
*1091 In January of 1979, William Bakker, a gáme warden with the California Department of Fish and Game, received complaints that the Middle Fork of the American River was unusually muddy. Bakker investigated, ultimately procured a Fish and Game helicopter to fly over the muddy stretch of the river, and took aerial photographs. He also later investigated the situation on foot and by vehicle. By working up the North Fork of the Middle Fork, Bakker determined that the source of mud and silt in the river was the Pacific Slab Placer Mine (Mine), a placer mine located on the North Fork of the Middle Fork of the American River in an area surrounded by familiar landmarks such as Mosquito Ridge, Cuckoo Ridge, Deadwood Ridge, Turkey Hill and Grouse Creek. In February 1979 the river was noticeably muddy for a stretch of 15 to 18 miles. Bakker concluded that the source of river siltation was discharge from the Mine, which obtained its water from a dam on Grouse Creek and which employed classic placer mining techniques: water from Grouse Creek was funneled through pipes at high pressure and then discharged through a monitor so as to blast the earth away. The monitor at the Mine was capable of putting out 12,000 gallons of water a minute. The runoff was carried through sluice boxes and was dumped into the river.
Following Bakker’s investigation, on March 18, 1979, a Fish and Game biologist, Harry Rectenwald, made his way to a point on the river located just below the discharge point of the Mine. There, Rectenwald found three feet of silt deposited along the banks of the river. He also inspected the river for aquatic insects necessary to sustain fish life, and Rectenwald took samples of insect life from above the point of the Mine discharge and from below the point of discharge. He concluded that the river below the Mine had been subject to a significant silt buildup and that, whereas aquatic insects above the point of mine discharge were happy and jiealthy, insect life below the Mine had been destroyed to a significant degree. Silt on the river bottom also prevents fish from laying their eggs in protective spaces that ordinarily exist between rocks and gravels. Subsequently, Rectenwald obtained discharge records kept by the Mine pursuant to requirements of a permit issued to the Mine by the California Water Quality Control Board.[2] *1092 These discharge records indicated that the Mine dumped significant amounts of sand and gravel into the river during the month of March 1979. For example, the records indicated that on March 9, 1979, some nine days before Rectenwald’s visit, the Mine discharged some 2,400 cubic yards of solid debris into the river. This discharge was approximately the same as having 200 full sized dump trucks dump their loads into the river at the same place on the same day.
Rectenwald left the river on March 18. He returned to the river during four days in July 1979 and conducted additional experiments. Thus, Rectenwald established four,inspection stations, one located upriver from the Mine and three located within eight miles below the Mine. At each inspection point, the biologist sampled aquatic insect life. He found samples of aquatic, insect life indicated a reduction of volume of insect life of about 90 percent below the point of discharge. Rectenwald also sampled the fish population by using an electric stunning device at two inspection points, one located above the mine discharge point and one below. He found about one-third as many fish at the station below the discharge point as he did at the station above the Mine.
Rectenwald left the river on July 24, 1979.
During the month of January 1980 the river reached flood stage. Indeed, the river reached its highest point since the winter of 1955. In the vicinity of the Mine, the high water mark was 30 to 40 feet above the ordinary river channel. The force of the river was such that it moved large granite boulders and caused the ground to shake. Downstream, near Auburn, automobile bridges were submérged. Suffice it to say that, by everyone’s account, the flood of January 1979 was one remarkable display of H2G.
On February 6, 1980, the District Attorney of Placer County filed a complaint in the Foresthill Judicial District Justice Court charging defendant with violation of section 5650, subdivision (f) Fish and Game Code.[3] The complaint alleged that, during the months of February and March of 1979, defendant “... did permit to pass into and deposit in *1093 the American River a substance and material deleterious to fish and plant life.”
Trial of the matter commenced January 29, 1981, in the Foresthill Justice Court. At the outset of trial, the parties stipulated that defendant Guntert was responsible for the operation, supervision and management of the Mine. Also at the outset of trial, the parties stipulated that defendant’s proposed jury instructions would be given, including the following: “‘Deleterious’ Defined If The word ‘deleterious’ as used in the statute means more than merely harmful in a negligible or transitory way; it is something noxious or pernicious, that will kill, destroy or cause severe injury to fish, birds or plants. A substance or material is not deleterious if it is not destructive of the life of fish, birds or plants to such a degree that the fish, birds or plants can no longer continue to inhabit the stream in their previous numbers and location.”
The aforementioned instruction (which was based in part upon an 1884 New York case) is not a correct statement of the law in California. It is a bad instruction, first, because it is nearly unintelligible. We recognize that if the standard circumstantial evidence instruction[4] can withstand attack, then almost any combination of words may constitute a permissible instruction. But we are not disposed to sanction an instruction that must leave the minds of jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the meaning of the language used.
The instruction is also bad because, to the extent that its meaning may be grasped, the instruction appears to require that a substance cause a permanent annihilation or displacement of fish or wildlife before the substance may be considered deleterious. We find no support for this position in California law. To the contrary, our courts have upheld injunctions against conduct deleterious to the health of human beings without requiring that the complainants either die or move away. (See e.g. Williams v. Blue Bird Laundry Co. (1927) 85 Cal.App. 388, 393 [259 P. 484], approved in, Gelfand v. O’Haver (1948) 33 Cal.2d 218, 222 [200 P.2d 790].) Moreover, as happened in this case, the stip *1094 ulated instruction could be interpreted so as to permit someone to dump sulfuric acid into a stream, to annihilate the fish population in the immediate vicinity of the dump, and to escape criminal responsibility by showing that the fish population subsequently recovered. We hardly think that the Legislature intended to sanction that possibility when it enacted Fish and Game Code section 5650.
Courts are required to give effect to statutes “. .. according to the usual, ordinary import of the language employed in framing them.” (Moyer v. Workmen’s Comp. Appeals Bd. (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224], quoting, In re Alpine (1928) 203 Cal. 731, 737 [265 P. 947, 58 A.L.R. 1500].) Webster defines “deleterious” as, “having an often obscure or unexpected harmful effect.”[5] We are also mindful that, “When used in a statute words must be construed in context, keeping in mind the nature and obvious purpose of the statute where they appear.” (Moyer v. Workmen’s Comp. Appeals Bd., supra.) The obvious purpose of section 5650, subdivision (f) is to protect the marine habitat of the waters of California. In this regard, we recognize that a little of a good thing, such as sand, will have no effect on marine life when it is deposited in a river but that too much of a good thing, such as sand, can produce very potent effects indeed on the marine habitat. Synthesizing Webster with the purpose of the statute, and keeping in mind that nobody wants to see boys prosecuted for skipping rocks on pools of the American River, we conclude that for purposes of Fish and Game Code section 5650, subdivision (f) a substance or material is deleterious if, because of its nature or quantity, it has a harmful effect on fish, plant life or bird life when it is deposited in the waters of the State of California.
Because the parties stipulated at the outset of trial to defendant’s erroneous instruction, and because the instruction served to frame the issues, the trial proceeded much like a pool game on an uneven table. The prosecution relied on the expert testimony discussed above. The defense attempted to rely on two experts who had studied the river in October and November 1980, well after the big flood, and, incidentally, well after the Mine had ceased mining operations. The experts had counted fish both above and below the Mine and had concluded that the fish population below the Mine was in good to excellent condition and was comparable to the population above the Mine. The defense experts found many big fish more than three years old below the Mine. *1095 Both prosecution and defense experts agreed that the flood had been wonderful for the fish, because the large volume of water had scoured the river and had restored the natural breeding habitat. The prosecution’s expert suggested that the flood had carried trout down from excellent tributary spawning streams.
On cross-examination by counsel for the People, defendant’s primary expert testified that he could not render an opinion as to the condition of the river before the flood of January 1980, “because I didn’t see the stream.” The prosecutor moved to strike all of the expert’s testimony but, without ruling on the motion, the Court gave a sua sponte instruction to the jury, over objection, telling the jury that they were to consider the defense expert’s testimony only with respect to conditions that existed after the flood and not before. During jury deliberations, the foreman of the jury told the court that the jury was confused about the date of the alleged violations arid the period of time of the defense expert’s testimony that they could consider. Again over objection, the court instructed the jury that the dates of the alleged violations were in February and March of 1979 and that the jury was to consider the defense expert’s testimony only with respect to the condition of the river after the flood, which, as everyone knew, occurred in January 1980.
The jury did its duty and promptly convicted the defendant.
The testimony of defendant’s experts, to the effect that marine' life in the river was in a healthy condition in 1980, obviously constituted testimony as to the condition of the river at a time subsequent to the violations. Evidence of a subsequent condition may be admissible to prove the condition of a thing at a prior time. (Witkin, Cal. Evidence (2d ed. 1966) § 356, p. 315; Slovick v. James I. Barnes Constr. Co. (1956) 142 Cal.App.2d 618, 624-625 [298 P.2d 923].) While we have in mind that the trial judge is entitled to a wide discretion in determining whether to allow the jury to consider such evidence,[6] we are also mindful that the trial court is bound by certain established rules of evidence. For example, “Except as otherwise provided by statute, all relevant evidence is admissible.” (Evid. Code, § 351. People v. Johnson (1975) 46 Cal.App.3d 701, 704 [120 Cal.Rptr. 372].) “Evidence is relevant when no matter how weak it may be, it tends to prove the issue before the jury. The weight of. such evidence is for the jury. (People v. Slocum (1975) 52 Cal.App.3d 867, 891 [125 Cal.Rptr. 442] (Citations *1096 omitted).) In determining whether evidence of a subsequent condition is admissible, the court can consider whether a party offering the evidence had had a reasonable opportunity to investigate evidence of the condition at a prior time. (See, e.g., Atkins v. Bisigier (1971) 16 Cal.App.3d 414, 426 [94 Cal.Rptr. 49].)
In this case, at the time the complaint was filed in February 1980, it was impossible for defendant to study the river itself as it existed at the time of the alleged violations. As a practical matter, the defendant had only one defense available to him—to study the river in 1980—and the trial judge’s instruction took that defense in its entirety from the jury. In the circumstances of this case, it was for the jury to determine whether the healthy three-year-old fish, found below the Mine by defendant’s experts, had been there in 1979 or whether those fish had been carried there by the great wall of water that thundered down the canyon in 1980.[7] In the peculiar circumstances of this case, the instruction was an abuse of discretion. Since the effect of the instruction was to deprive the defendant of his defense, the error is reversible. (People v. Spearman (1979) 25 Cal.3d 107, 119 [157 Cal.Rptr. 883, 599 P.2d 74].)
Since the case must be remanded to the trial court, it is appropriate to comment on another ground of appeal pursued by defendant in this court. Defendant alleges that he was prejudiced by the delay between the date of the violation (Feb.-Mar. 1979) and the date of the filing the complaint (Feb. 1980). Defendant did not raise the issue of this precomplaint delay in the trial court, presumably because having obtained his crucial instruction by stipulation at the outset of the trial, he believed that he would have a good defense by showing that the fish population had not been permanently eradicated by the mine discharge. Although we believe that defendant is somewhat in the position of one who has dropped a sandbag on his own foot, we recognize that defendant had good cause to raise the delay objection only at the conclusion of trial when the trial court instructed the jury as it did. Since the issue of delay is fundamental, and since the undisputed time sequence of this case indicates that defendant’s due process rights are at stake, we believe that the issue should be aired. (People v. Mills (1978) 81 Cal.App.3d 171, 176 [146 Cal.Rptr. 411].) Moreover, the People, having filed no brief in our court, are in no position to complain.
*1097 In this case, the prosecution’s chief expert last examined the river in July 1979. The criminal complaint was not filed until February 1980, at a time when, by all accounts at trial, a flood had changed the river so dramatically that all direct evidence of guilt or innocence had been obliterated. The record discloses no reason for the delay of more than six months between the completion of the prosecution expert’s tests and the filing of the complaint. Where a defendant alleges that his right to a speedy trial has been violated by prearrest delay, the court must balance the prejudicial effect of delay and any justification therefor in order to determine whether defendant’s right has been violated. (Scherling v. Superior Court (1978) 22 Cal.3d 493, 504 [149 Cal.Rptr. 957, 585 P.2d 219].) The prejudicial effect of the delay in this case is evident. However, we have no record before us to indicate whether defendant might have requested the delay in filing charges or whether some other ground of justification for the delay may exist. Accordingly, the trial court should conduct an evidentiary hearing on this matter in advance of any retrial.
For the foregoing reasons, the judgment is reversed and the matter is remanded to the trial court for proceedings in accordance with this opinion.
Couzens, P. J., and Wylie, J., concurred.

For a history and explanation of placer mining, see Averill, Placer Mining for Gold in California (Cal. State Printing Off. 1946).

Placer mining may be subject to control by various laws and agencies. (See, e.g. Water Code, § 13050 et seq., Pub. Resources Code, § 2551 et seq., and legislation establishing the Cal. Debris Com., U. S. Comp. Stats. 1901, p. 3553.) Defendants have not alleged, either in the trial court or in this court, that the Fish and Game Code violation at issue in this case is preempted by any other body of law. (Cf., 33 Ops.Cal.Atty.Gen. 77 (1959); County of Sutter v. Nicols, supra, 152 Cal. 688; People v. Union Oil Co. (1968) 268 Cal.App.2d 566 [74 Cal.Rptr. 78].)

Section 5650, subdivision (f) of the Fish and Game Code provides: “It is unlawful to deposit in, permit to pass into, or place where it can pass into the waters of this State any of the following:
“(f) Any substance or material deleterious to fish, plant life, or bird life.”

CALJIC No. 2.00.

Webster’s New Collegiate Dictionary (1975) page 299.

Larson v. Solbakken (1963) 221 Cal.App.2d 410, 420 [34 Cal.Rptr. 450].

This much is clear: if those fish were carried down the river by the flood waters, those fish will be telling that story to their grandfish for years to come.