[No. C003345. Third Dist. Mar. 30, 1989.]

LAKE MADRONE WATER DISTRICT, Plaintiff and Appellant, v. STATE WATER RESOURCES CONTROL BOARD, Defendant and Respondent.

164

**COUNSEL**

Paul R. Minasian, Michael V. Sexton and Minasian, Minasian, Minasian, Spruance, Barber, Meith & Soares for Plaintiff and Appellant.

John K. Van de Kamp, Attorney General, R. H. Connett, Assistant Attorney General, and M. Anne Jennings, Deputy Attorney General, for Defendant and Respondent.

**OPINION**

**SIMS, J.**—In this case, we hold that the State Water Resources Control Board (State Board) lawfully ordered operators of a dam to refrain from flushing accumulated sediment into a creek, and to submit a plan for clean-up of the sediment, because the operators caused the discharge of "waste" under the Porter-Cologne Water Quality Control Act[1] (Wat. Code, § 13000 et seq.; all undesignated statutory references are to the Water Code.)

### FACTUAL AND PROCEDURAL BACKGROUND

Lake Madrone is a private recreational lake used by the owners of houses and cabins on its shores. It was created in 1930 by the building of a dam to

---

[1] Referred to as the Porter-Cologne Act for convenience.

impound the waters of Berry Creek and a tributary creek. Plaintiff Lake Madrone Water District (District), formed in 1975 by the owners of about 130 homes adjacent to the lake, operates the dam.

Sediment regularly flows into Lake Madrone from upstream sources. In 1975, investigations by the State Board and the Regional Water Quality Control Board (Regional Board) found many sources of sediment, including road construction and maintenance, logging, and land development, but determined there was insufficient evidence to undertake enforcement actions against any entity. Investigations performed at the District's request in 1985 failed to find any upstream source of the siltation in Lake Madrone.

The District does not own land within the watershed of the lake, nor where the silt originates, nor does it own the bed of Lake Madrone.

The dam operated by the District releases water out of the lake in different ways, depending on the water level in the lake. When the level is at its lowest, water is discharged by opening a gate valve at the base of the dam. The opening of this valve flushes accumulated sediment into Berry Creek.

In the spring of 1984, staff of the Regional Board and the State Department of Fish and Game investigated Lake Madrone and Berry Creek in response to complaints from downstream water users that large amounts of silt had been deposited in the creek. Lake Madrone was almost empty, and thousands of cubic yards of sediment had accumulated at its bottom. Silt was deposited in Berry Creek (up to 18 inches deep by the second inspection), choking its pools and shoreline and clogging its spawning areas so heavily as to destroy fish and aquatic life. The silt remained in the creek for nearly two years, until early 1986, when heavy rains washed it away. The inspectors concluded the sediment could have entered the creek only from repeated opening of the gate valve in Lake Madrone Dam.

Between March and November of 1984, Regional Board staff corresponded and met with representatives of the District about the problem, but no satisfactory solution was achieved.

Because the District's actions to date led the Regional Board's executive officer to fear the District would operate the gate valve in the near future without adequate safeguards, on November 29, 1984, the executive officer issued an abatement order (§§ 13304, 13323, subd. (a)) to the District. The order required the District to refrain from opening the gate valve before a technically sound plan had been developed to prevent the release of

sediment into Berry Creek at a rate greater than that at which it entered the lake.

Thereafter, both the Regional Board and the State Board upheld the abatement order. The State Board's order also required the District to submit a plan to the Regional Board for removing downstream sediment from Berry Creek.

In November 1985 the District filed a petition for writ of mandate in Butte County Superior Court. (Code Civ. Proc., § 1094.5.) It sought revocation of the State Board's order, a declaration that the State Board's order imposed state-mandated costs reimbursable to the District under article XIII B, section 6, of the California Constitution, and attorney's fees pursuant to Code of Civil Procedure section 1021.5.

In November 1985 the District also filed a claim with the Commission on State Mandates (Commission) pursuant to Government Code section 17550 et seq. The Commission denied the claim in April 1986. However, the District did not petition for a writ of mandate to challenge the Commission's ruling, nor did the District try to amend the instant writ petition to name the Commission as a party.

The trial court denied the District's writ petition and the District appeals from the adverse judgment, alleging the trial court erred by denying its petition for the following reasons: (1) the sediment which it released into Berry Creek is not "waste" as defined in the Porter-Cologne act; (2) even if the sediment is waste under the act, the District is not a "discharger" subject to regulation by the State Board; and (3) the State Board's order imposed state-mandated costs on the District where no federal or state financial assistance is available to the District to meet those costs, thereby violating article XIII B, section 6, of the California Constitution and Government Code section 17516. Finally, the District seeks attorney's fees for maintaining this action, pursuant to either Government Code section 17516 or Code of Civil Procedure section 1028.5.

We shall hold that the trial court ruled correctly on the District's definitional contentions, that the District cannot raise the issue of state-mandated costs in this action, and that attorney's fees are not available to the District.

DISCUSSION

I

*The District's Discharge of Sediment Was Subject to Abatement Under the Porter-Cologne Act.*

A. *Standard of Review.*

▪ In the proceedings below, the trial court exercised its independent judgment on the whole record, as required by section 13330. Because the administrative proceeding is adjudicatory in nature, we review the whole record to determine whether the trial court's findings are supported by substantial evidence. (*Franz* v. *Board of Medical Quality Assurance* (1982) 31 Cal.3d 124, 135 [181 Cal.Rptr. 732, 642 P.2d 792]; *Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 143, fn. 10 [93 Cal.Rptr. 234, 481 P.2d 242].)

B. *The District's Collected Sediment Constitutes "Waste" Under Section 13050.*

The authority for the cleanup and abatement order at issue is found in sections 13304 and 13050.

Subdivision (a) of section 13304 provides in pertinent part: "Any person . . . who has caused or . . . causes . . . any waste to be discharged or deposited where it is, or probably will be, discharged into the waters of the state and creates, or threatens to create, a condition of pollution or nuisance, shall upon order of the regional board clean up such waste or abate the effects thereof or, in the case of threatened pollution or nuisance, take other necessary remedial action."

Subdivision (d) of section 13050 provides in pertinent part: " 'Waste' includes sewage and any and all other waste substances, liquid, solid, gaseous or radioactive, associated with human habitation, or of human or animal origin, or from any producing, manufacturing, or processing operation of whatever nature, . . ."

▪ The District first asserts the trial court erred because: "The silt material passing through the gate valve of the Lake Madrone Dam is not 'waste' as that term is defined in the Water Code because the silt is not discharged from any producing, manufacturing, or processing operation, or from land owned by the District." The District argues the Legislature did not intend to place cleanup responsibility upon a party unless the party

produced or created the waste. The District says dam operators cannot be legally responsible for chemical, sewage, silt or other waste materials "simply because the deleterious materials may reside for the briefest period of time in the reservoir before passing downstream." The District suggests that such a construction of the statute would unfairly place the costs of purifying the state's waters on the operators of dams or transmission facilities through which the waters pass.

Insofar as these arguments are aimed at subdivision (d) of section 13050, they misperceive the purpose of the statute. Subdivision (d) of section 13050 merely promulgates a qualitative definition of "waste." The statute does not assign responsibility for its abatement or cleanup.

There is no doubt that concentrated silt or sediment associated with human habitation and harmful to the aquatic environment is "waste" under the statute. The Porter-Cologne Act was intended to "implement the legislative recommendations of the final report of the State Water Resources Control Board submitted to the 1969 Regular Session of the Legislature entitled 'Recommended Changes in Water Quality Control,' prepared by the Study Project-Water Quality Control Program." (Stats. 1969, ch. 482, § 36, p. 1088; see Robie, *Water Pollution: An Affirmative Response by the California Legislature* (1970) 1 Pacific L.J. 2.) "Appendix A" of that report, cited by both the Assembly and Senate reports on the Porter-Cologne Act as reflecting the intent of the Legislature (2 Assem. J. (1969 Reg. Sess.) pp. 2677-2679; 2 Sen. J. (1969 Reg. Sess.) pp. 3933-3934), set forth proposed legislation and notes thereto. Appendix A stated the definition of "waste" in the proposed act was intended to include all interpretations of "sewage," "industrial waste" and "other waste" in previous Attorney General opinions. (See also Hingerty, *Property Owner Liability for Environmental Contamination in California* (1987) 22 U.S.F. L.Rev. 31, 74-77.) These included 27 Ops.Cal.Atty.Gen. 217 (1956), which states that the discharge of fine-grained materials into a stream used for fishing and fish spawning would constitute pollution if the fishery were adversely affected. (*Id.,* at p. 219.)

This leaves the question whether the concentrated sediment that clogged Berry Creek was "associated with human habitation" within the meaning of subdivision (d) of section 13050. The answer is "yes," because the concentrated sediment was produced by the dam which was built by humans in aid of habitation on the shores of Lake Madrone.

Contrary to the District's suggestions, its dam is not a mere conduit through which a substance dangerous to aquatic life (e.g., a chemical) passes. Rather the dam receives a natural substance—silt—which, in its

unconcentrated form in a creek is innocuous and, by furnishing a man-made artificial location for its concentration, changes the innocuous substance into one that is deadly to aquatic life. (See *People* v. *Guntert* (1981) 126 Cal.App.3d Supp. 1, 8 [179 Cal.Rptr. 426].) Thus, the dam is a *producer* of waste, as the following finding in the trial court's statement of decision reflects: "The dam at Lake Madrone impedes the flow of the tributary creeks and as a result whatever sediment is suspended in the creek, for the most part, settles to the bottom of the lake. When the gate valve is opened, because of its location, it draws sediment from the bottom of the lake in a high concentration.  ▮ ▮▮ ▮ ▮  Once the sediment is trapped by the dam it is the operation of the gate valve that controls the discharge of the silt."[2]

The District also cites 27 Ops.Cal.Atty.Gen. 182 (1956) for the proposition that the sediment is not "waste" because it is not sewage or industrial waste. However, in that opinion the Attorney General was construing *former section* 13005, which provided: " 'Sewage' means any and all waste substance, liquid or solid, associated with human habitation, or which contains or may be contaminated with human or animal excreta or excrement, offal, or any feculent matter." [¶] " 'Industrial waste' means any and all liquid or solid waste substance, not sewage, from any producing, manufacturing or processing operation of whatever nature." (Stats. 1949, ch. 1549, § 1, p. 2783; repealed Stats. 1969, ch. 482, § 17, p. 1051.) The Attorney General had no occasion to construe current section 13050, containing an expanded definition of "waste." Closer on point is 63 Ops.Cal.Atty.Gen. 51 (1980), taking the view that silt-bearing drainage from Malakoff Diggins State Historic Park is "waste" subject to control under the Porter-Cologne Act.

Finally, the District asserts the sediment is not waste because it was not discharged from land owned by the District. However, subdivision (d) of section 13050 contains no requirement that "waste" be discharged from land owned by a discharger.

---

[2] At oral argument, the District contended no substantial evidence supports a finding that the dam concentrates sediment. The contention is waived by the District's failure to brief the issue (*Foreman & Clark Corp.* v. *Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362]) but in any event is not well taken. The trial court had before it reports by Regional Board inspectors reporting on the *accumulation* of sediment in Lake Madrone. Moreover, other reports indicated "The character of the stream would normally be small bed rock pools and short cobble riffles." Following the discharge from the dam, "Pools now contain a foot or more of sediment, and an inch or two of sediment covers the riffles with few exposed rocks." The change in character of the stream immediately following the District's discharge from the dam, together with the magnitude of the sediment discharge, permits an inference that the dam served to consolidate the suspended sediment and convert it into a substance dangerous to aquatic life. Substantial evidence supports the trial court's finding.

We hold that the concentrated sediment flushed from the dam was "waste . . . associated with human habitation, . . ." within the meaning of subdivision (d) of section 13050.

C. *The District Has Caused Waste to Be Discharged Into the Waters of the State*.

The District next argues it is not a "discharger" of waste under the Porter-Cologne Act.

The relevant inquiry is whether under section 13304 the District "has caused . . . or . . . causes . . . any waste to be discharged . . . into the waters of the state . . . ."

To the extent the District suggests it did not cause any waste to be discharged, because it assertedly did not produce the sediment flushed from the dam, the argument is invalid for reasons previously discussed.

The District also argues that it has not "discharged" waste because the definition of "discharge" in the Federal Water Pollution Control Act (33 U.S.C.S. § 1251 et seq., hereafter Clean Water Act) applies to the Porter-Cologne Act and excludes the District's flushing of sediment from its dam.

"Discharge" is defined in the Clean Water Act as follows (33 U.S.C.S. § 1362(12), (16)): "(12) The term 'discharge of a pollutant' . . . means . . . any addition of any pollutant to navigable waters from any point source, . . ."

"(16) The term 'discharge' when used without qualification includes a discharge of a pollutant, . . ."

The District claims it has not "discharged" a pollutant from a "point source." However, in this case we have no occasion to determine whether the flushing of sediment from the dam constitutes a "point source" discharge under the Clean Water Act, because contrary to the District's argument, the federal act's definition of "discharge" does not control the meaning of the term in section 13304.[3] We shall therefore assume for purposes of

---

[3] However, we note that the District's construction of the Clean Water Act is not supported by the authorities it cites. The District relies on *National Wildlife Federation* v. *Gorsuch* (D.C. Cir. 1982) 693 F.2d 156 [224 App.D.C. 41] and *Appalachian Power Co.* v. *Train* (4th Cir. 1976) 545 F.2d 1351. However, neither case applies to the facts here. Although *National Wildlife Federation* considered whether the Clean Water Act regulated the discharge of dam waters with low dissolved oxygen (693 F.2d at pp. 161-162), dissolved minerals and nutrients

argument the District's flushing does not constitute a point-source discharge under the Clean Water Act.

In support of its claim that the federal "point source" definition of discharge applies to section 13304, the District cites section 13373, which provides in pertinent part: "The terms . . . 'discharge' and 'point sources' *as used in this chapter* shall have the same meaning as in the Federal Water Pollution Control Act and acts amendatory thereof or supplementary thereto." (Italics added.)

The chapter referenced in section 13373 is chapter 5.5 of division 7 (hereafter chapter 5.5). Section 13304 is found in chapter 5, not chapter 5.5, so the definitions in section 13373 do not necessarily apply to section 13304. As we shall explain, section 13304 adopts a broader definition of "discharge" than is found in the Clean Water Act, and the broader definition is entirely consistent with the federal act.

Chapter 5.5 was enacted in 1972 (Stats. 1972, ch. 1256, § 1, p. 2485) to allow the State of California to administer the National Pollutant Discharge Elimination System (NPDES) permits program. (§§ 13370; 13372; *Pacific Water Conditioning Assn., Inc.* v. *City Council* (1977) 73 Cal.App.3d 546, 556 [140 Cal.Rptr. 812]; see *EPA* v. *State Water Resources Control Board* (1976) 426 U.S. 200, 205-208 [48 L.Ed.2d 578, 583-585, 96 S.Ct. 2022]; *United States* v. *State Water Resources Control Bd.* (1986) 182 Cal.App.3d 82, 107-109 [227 Cal.Rptr. 161]; Attwater and Markle, *Overview of California Water Rights and Water Quality Law* (1988) 19 Pacific L.J. 957, 1004-1005.)

"One of the primary features of the 1972 amendments [to the Clean Water Act] is the establishment of the National Pollutant Discharge Elimination System (NPDES), a federal permit program designed to regulate the discharge of polluting effluents. [Citations.] Section 301(a) of the Act, 33 U.S.C. § 1311(a) [33 U.S.C.S. § 1311(a)], generally prohibits the discharge of any effluent into a navigable body of water unless the point source has

---

(*id.*, at p. 163), temperature changes (*ibid.*) and excess aeration (*id.*, at p. 164), the court noted, "There is no evidence in the record to suggest that increased sediment is a major problem." (*Ibid.*, fn. omitted.) The court's single, brief suggestion that excess sediment was at issue (*id.*, at p. 171) was therefore dictum. Similarly, on the point cited by the District, *Appalachian Power Co.* considered whether the Clean Water Act regulated *chemical* pollutants entering electric generating plants in their intake waters. (545 F.2d at p. 1377.) *State of Mo.* ex rel. *Ashcroft* v. *Dept. of the Army* (8th Cir. 1982) 672 F.2d 1297 is similarly inapposite as it involved the reduction of oxygen in, and downstream erosion caused by, waters discharged from a dam. Although not cited by the District, *U.S.* ex rel. *TVA* v. *Tenn. Water Quality Control Bd.* (6th Cir. 1983) 717 F.2d 992 concerned a diminution in the *quantity* of water released from a dam.

obtained an NPDES Permit from the Environmental Protection Agency (EPA). The permits contain detailed effluent limitations, and a compliance schedule for the attainment of these limitations.

"The amendments also recognize that the States should have a significant role in protecting their own natural resources. 33 U.S.C. § 1251(b) [33 U.S.C.S. § 1251(b)]. The Act provides that the Federal Government may delegate to a State the authority to administer the NPDES program with respect to point sources located within the State, if the EPA Administrator determines that the proposed state program complies with the requirements set forth at 33 U.S.C. § 1342(b) [33 U.S.C.S. § 1342(b)]" (*International Paper Co.* v. *Ouellette* (1987) 479 U.S. 481, 489 [93 L.Ed.2d 883, 895, 107 S.Ct. 805]).

■ The fact that a state qualifies to administer NPDES permits does not preclude the state from adopting more stringent controls on discharges into the waters of the state[4] than are required under the Clean Water Act. With respect to such discharges "the source State may require discharge limitations more stringent than those required by the Federal Government. [Citation.]" (*International Paper Co.*, supra, 479 U.S. at p. 490 [93 L.Ed.2d at p. 895]; 33 U.S.C.S. § 1370;[5] see *Southern Cal. Edison Co.* v. *State Water Resources Control Bd.* (1981) 116 Cal.App.3d 751, 758 [172 Cal.Rptr. 306].) In particular, Congress intended that nonpoint sources of pollution would be subject to regulation by the states. (*National Wildlife Federation* v. *Gorsuch* (D.C. Cir. 1982) 693 F.2d 156, 176.)

■ Thus, even upon the assumption the discharge from the dam is a nonpoint source of pollution, it remains subject to regulation by the laws of this state. The applicable California law is found in section 13304. That

---

[4] A state affected by pollution originating in another state may not impose its own controls that are more stringent than those set out in the Clean Water Act. (*International Paper Co.* v. *Ouellette, supra,* 479 U.S. at p. 497 [93 L.Ed.2d at p. 900].) Here, of course, the discharge of waste was into the waters of this state.

[5] Section 1370 of title 33 of the United States Code provides: "Except as expressly provided in this [Clean Water] Act, nothing in this Act shall (1) preclude or deny the right of any State or political subdivision thereof or interstate agency to adopt or enforce (A) any standard or limitation respecting discharges of pollutants, or (B) any requirement respecting control or abatement of pollution; except that if an effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of performance is in effect under this Act, such State or political subdivision or interstate agency may not adopt or enforce any effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of performance which is less stringent than the effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of performance under this Act; or (2) be construed as impairing or in any manner affecting any right or jurisdiction of the States with respect to the waters (including boundary waters) of such States."

section contains no suggestion the Legislature intended discharges of waste to be limited to point source discharges, particularly in light of the Legislature's express confinement of the "point source" definition to chapter 5.5.

We find nothing in the Porter-Cologne Act suggesting we should deviate from our usual obligation to give effect to statutes according to the ordinary import of the language used in framing them. (*California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.3d 692, 698 [170 Cal.Rptr. 817, 621 P.2d 856], followed in *People* v. *Morris* (1988) 46 Cal.3d 1, 15 [249 Cal.Rptr. 119, 756 P.2d 843].) Thus, as used in section 13304, "discharge" means: "to relieve of a charge, load or burden; . . . to give outlet to: pour forth: EMIT . . . ." (Webster's New Internat. Dict. (3d ed. 1961) p. 644.) This definition is congruent with the Legislature's directive that "water quality control" means "the regulation of any activity or factor which may affect the quality of the waters of the state . . . ." (§ 13050, subd. (i), *Southern Cal. Edison Co.* v. *State Water Resources Control Bd.,* *supra,* 116 Cal.App.3d at p. 758.) According to this definition, the burden of sediment emitted by the opening of the gate valve in Lake Madrone Dam is a discharge.

This conclusion does not run afoul of section 13372, which prohibits any conflicts between chapter 5.5 and other provisions of the Porter-Cologne Act in order to "assure consistency with the requirements for state programs implementing the [Clean Water Act] and acts amendatory thereof or supplementary thereto."[6] Although, as we have pointed out, the Clean Water Act envisions that a state may enact more stringent controls on discharges than are required by the federal act, we need not determine whether the definition of "discharge" in section 13304 would be properly applied, consistent with section 13372, to the grant or enforcement of an NPDES permit. The cleanup and abatement order at issue here did not involve an NPDES permit, nor any planning function, nor any other action required of California under the Clean Water Act. (See Attwater and Markle, *op. cit.* *supra,* 19 Pacific L.J. at pp. 996-1012.) Rather, section 13304 was invoked to abate and clean up the discharge of waste without regard to a waste

---

[6]Section 13372 provides in pertinent part: "This chapter shall be construed to assure consistency with the requirements for state programs implementing the [Clean Water Act] and acts amendatory thereof or supplementary thereto. To the extent other provisions of this division are consistent with the provisions of this chapter and with the requirements for state programs implementing the [Clean Water Act] and acts amendatory thereof or supplementary thereto, those provisions shall be applicable to actions and procedures provided for in this chapter. The provisions of this chapter shall prevail over the other provisions of this division to the extent of any inconsistency. The provisions of this chapter shall apply only to actions required under the [Clean Water Act] and acts amendatory thereof or supplementary thereto. . . ."

discharge permit. (See *In the Matter of the Petition of Robert James Claus,* SWRCB Order No. WQ 85-1 (1985) p. 10.) As we have discussed, by controlling what is assumed to be a nonpoint discharge of waste into the waters of this state, the State Board properly performed a state regulatory function in a manner expressly contemplated by the Clean Water Act. (33 U.S.C.S. § 1370; *International Paper Co.* v. *Ouellette, supra,* 479 U.S. at pp. 498-499 [93 L.Ed.2d 883, 900-901].) As applied in the setting of this case, the definition of "discharge" in section 13304 therefore tenders no conflict with the Clean Water Act nor with section 13372.

## II

*The District May Not Pursue State-mandated-costs Claims in This Action.*

■ The District contends the State Board's order improperly imposed "state-mandated costs" under article XIII B, section 6, of the California Constitution, without providing the funds to meet those costs. This contention is not properly before us. Having presented a claim for reimbursement to the Commission which was denied, the District's exclusive statutory remedy is to petition for a writ of mandate against the Commission.

Article XIII B, section 6, of the California Constitution provides in part: "Whenever the Legislature or any state agency mandates a new program or higher level of service on any local government, the state shall provide a subvention of funds to reimburse such local government for the costs of such program or increased level of service, . . ."

The statutory scheme implementing this provision is contained in part 7 of division 4 of title 2 of the Government Code (statutory references in this part are to the Government Code). (§ 17500 et seq; see *Lucia Mar Unified School Dist.* v. *Honig* (1988) 44 Cal.3d 830, 833-834 [244 Cal.Rptr. 677, 750 P.2d 318].) These statutes define "state-mandated costs" (§ 17514) and create the Commission as the sole body empowered to hear claims for state-mandated costs. (§ 17525 et seq.)

Procedures for reimbursement of local agencies and school districts for costs mandated by the state are found in chapter 4 of part 7. (§ 17550.) Section 17552 provides in pertinent part, "This chapter [4] shall provide the sole and exclusive procedure by which a local agency or school district may claim reimbursement for costs mandated by the state . . . ." Section 17559, a part of chapter 4, authorizes the commencement of a proceeding in

administrative mandate (Code Civ. Proc., § 1094.5), to set aside a decision of the Commission. Pursuant to the plain command of section 17552, the administrative mandate procedure is the exclusive way for a local agency to claim reimbursement for state-mandated costs. (See *Lucia Mar Unified School Dist.* v. *Honig, supra,* 44 Cal.3d at pp. 833-834.)

The District filed a claim with the Commission pursuant to the statutory scheme. The Commission denied the claim.[7] Since the District has not proceeded as required by sections 17550 and 17559—indeed has never named the Commission as a party to this lawsuit—its contentions are not cognizable in this action.[8]

## DISPOSITION

The judgment is affirmed.

Carr, Acting P. J., and Deegan, J.,* concurred.

Appellant's petition for review by the Supreme Court was denied June 21, 1989.

---

[7] In its opening brief, the District did not explain why it had failed to follow its exclusive remedy of administrative mandate against the Commission under the statutory scheme but instead inappropriately sought trial court review by way of its petition against the State Board. In its reply brief, the District asserted the Commission did not actually deny its claim but merely "[declined] to rule upon the claim until a determination was made in this action as to whether the order of the [State Board] was exempt from the State mandated costs." It cites us to a letter written to the Commission *by counsel for the District* after the hearing, which indeed characterizes the Commission's action in this way. However, the transcript of the hearing before the Commission plainly shows the claim was denied.

[8] This includes the District's contention it is entitled to attorneys fees as a state-mandated cost. Moreover, to the extent the District seeks fees on any other basis, and apart from any other consideration, it has not shown how it is entitled to fees in light of its failure to prevail.

* Assigned by the Chairperson of the Judicial Council.