[No. A124351. First Dist., Div. Two. Mar. 30, 2010.]

KARUK TRIBE OF NORTHERN CALIFORNIA et al., Plaintiffs and Appellants, v.
CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD, NORTH COAST REGION, Defendant and Respondent;
PACIFICORP, Real Party in Interest and Respondent.

[No. A124369. First Dist., Div. Two. Mar. 30, 2010.]

KARUK TRIBE OF NORTHERN CALIFORNIA et al., Plaintiffs and Respondents, v.
CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD, NORTH COAST REGION, Defendant and Appellant;
PACIFICORP, Real Party in Interest and Respondent.

[No. A124370. First Dist., Div. Two. Mar. 30, 2010.]

KARUK TRIBE OF NORTHERN CALIFORNIA et al., Plaintiffs and Respondents, v.
CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD, NORTH COAST REGION, Defendant and Respondent;
PACIFICORP, Real Party in Interest and Appellant.

332

## Counsel

Lozeau Drury, Michael R. Lozeau, Richard T. Drury and David A. Zizmor for Plaintiffs and Appellants and for Plaintiffs and Respondents.

Edmund G. Brown, Jr., Attorney General, Mary Hackenbracht, Assistant Attorney General, and John Davidson, Deputy Attorney General, for Defendant and Appellant and for Defendant and Respondent.

Latham & Watkins, Karl S. Lytz and Andrea H. Hogan for Real Party in Interest and Appellant and for Real Party in Interest and Respondent.

## Opinion

**RICHMAN, J.**—These three appeals are the result of a rather unusual combination of administrative and judicial proceedings to determine whether state law regulating water quality can be applied to dams licensed by an agency of the federal government. A number of private parties asked the

California Regional Water Quality Control Board, North Coast Region (Board), to enforce California's law governing waste discharge to several hydroelectric dam-reservoirs on the Klamath River. The Board—having twice attempted to assert state law on this very subject and having twice been decisively and unanimously rejected by the United States Supreme Court and the Ninth Circuit Court of Appeals—declined, on the ground that all power on the subject belonged to the federal government by virtue of the Federal Power Act (FPA; 16 U.S.C. § 791a et seq.). The trial court ultimately agreed with this view, refusing to issue a writ of mandate compelling the Board to enforce the state's law.

But before reaching that determination, and on its own initiative, the trial court sent the matter back to the Board so that it could reconsider its initial refusal in light of two decisions by the United States Supreme Court, which the court believed deserved "a more complete response" by the Board than appeared in its original resolution rejecting the private parties' request. The Board again concluded that it was powerless to act. This time the court agreed with the Board that federal law did indeed preempt state power. Nevertheless, after entering a final judgment denying plaintiffs any relief, the trial court awarded them $138,250 in attorney fees, half of which was to be paid by the Board and half by the dams' owner. The court determined that this award was proper under Code of Civil Procedure section 1021.5 (section 1021.5) because the litigation had resulted in the "important public benefit" of the Board making "a thoughtful and well-reasoned determination" concerning its lack of authority to enforce state law.

We affirm the judgment because the Board and the trial court correctly recognized that for at least half a century federal law has been supreme when it comes to the subject of regulating hydroelectric dams operating under a federal license.

We reverse the attorney fee order because three of the statutory prerequisites to an award under section 1021.5 are absent. First, the initiators of this litigation cannot qualify as the "successful" parties in that in no sense did they achieve their strategic objective. Second, this was not an action that "resulted in the enforcement of an important right affecting the public interest." And third, this is not a case where "a significant benefit . . . has been conferred on the general public or a large class of persons." (§ 1021.5.) The best that can be said for the unorthodox proceedings that occurred here is that the Board, following what was in effect a remand from the trial court, augmented the reasoning behind its decision that it was without authority to grant the private parties' request that it enforce state law. Federal law was accepted as preeminent by the Board when this controversy began—and by the trial court when it ended. We conclude, as a matter of law, that it is not

worth $138,250 to have a state agency polish up and augment the recitals and reasoning supporting a decision that was already more than legally sufficient.

## BACKGROUND

The Klamath River is one of the most significant waterways in the far western continental United States. More than 260 miles long, it originates in Oregon but ends in California, when it joins the Pacific Ocean at Requa in Del Norte County. The river is also an important source of hydroelectric power. The Klamath Hydroelectric Project generates 161 megawatts of electricity. The project is comprised of five dams in both Oregon and California. The project is owned and operated by PacifiCorp, an Oregon corporation. On the California side, the Copco and Iron Gate reservoirs sit behind eponymous dams, both of which are located in Siskiyou County.[1] At all relevant times, PacifiCorp's application for the project's relicensing was pending before the Federal Energy Regulatory Commission (FERC).[2]

In February 2007, a petition was filed with the Board by four plaintiffs: the Karuk Tribe of Northern California, Klamath Riverkeeper, Pacific Coast Federation of Fishermen's Associations, and Institute for Fisheries Research[3] (hereinafter collectively, plaintiffs). The purpose of the petition was to get the

---

[1] "Copco" is apparently an acronym of California Oregon Power COmpany, which originally built and operated the Klamath Hydroelectric Project's installations before merging with PacifiCorp in 1961. In actuality, there are two Copco dams, each with its own reservoir, called Copco No. 1 and Copco No. 2. Copco No. 1—the first on the river—was constructed in 1917 and 1918 and is much the larger of the two installations. Copco No. 2, located only a quarter-mile downriver, was built in 1925, but it has greater importance in generating electricity (27 megawatts as opposed to 20 for Copco No. 1). We mention these details because it is not certain from plaintiffs' complaint and other filings whether this action is aimed at one or both Copco facilities. Although it is of no consequence to these appeals, we shall assume that plaintiffs did target both Copco facilities.

The Iron Gate Dam is the newest of the facilities named in plaintiffs' complaint. Constructed in 1962, it is located several miles downriver from the Copco dams. It is by far the largest of the dams, and is authorized to generate 18 megawatts. Once past this facility, the Klamath River flows unobstructed to the sea.

[2] The licensing process apparently moves at a glacial pace. PacifiCorp applied for relicensing in 2004, two years before the existing 50-year license would expire. Our record ends in December of 2008, with no indication that a final decision had been made on PacifiCorp's application. It also appears that PacifiCorp can continue to operate the project until that decision is made, and that PacifiCorp is planning to decommission parts of the facilities in the project. (See 71 Fed.Reg. 13384 (Mar. 17. 2006) [FERC "Notice of Authorization for Continued Project Operation"].)

[3] In the petition subsequently filed in superior court, the Karuk Tribe describes itself as "a federally-recognized tribe with ancestral homelands bisected by the Klamath River" whose members "engage in subsistence and recreational fishing" and other activities in or near the river. The three other entities are described as California nonprofit corporations with commercial and recreational interests in the river and its environs.

Board to "order PacifiCorp to submit a Report of Waste Discharge (ROWD) for its discharges . . . [of] pollutants from the Copco and Iron Gate Reservoirs, and issue waste discharge requirements (WDR) establishing appropriate restrictions and prohibitions safeguarding the beneficial uses of the waters of the Klamath River."

The Board conducted a public hearing on the petition, and denied it with resolution No. R1-2007-0028 in April 2007. The reason for the denial was that federal law preempted application of California law, specifically the Porter-Cologne Water Quality Control Act (Wat. Code, § 13000 et seq.; Porter-Cologne), which requires reports of waste discharge (ROWD's) and waste discharge requirements (WDR's). (*Id.*, §§ 13260–13273.1.)[4] Plaintiffs' request for review was denied by the State Water Resources Control Board in July 2007.

---

[4] The pertinent language of the Board's resolution is as follows:

"California Water Code section 13260(a) requires that any person discharging waste or proposing to discharge waste within any region that could affect the quality of the waters of the state, other than into a community sewer system, shall file with the . . . Board a ROWD containing such information and data as may be required by the . . . Board, unless the . . . Board waives such requirement. Discharges from the tailrace of a dam are considered a 'discharge of waste' under the Porter-Cologne Water Quality Control Act. (*Lake Madrone Water Dist. v. [State Water Resources Control Bd.* (1989)] 209 Cal.App.3d 163 [256 Cal.Rptr. 894] . . . .)

". . . The Petitioners request that the Regional Water Board order PacifiCorp to file a ROWD and/or issue WDRs for Copco and Iron Gate Reservoirs, pursuant to the California Water Code. These hydroelectric facilities are regulated under the Federal Power Act through a federal license by the Federal Energy Regulatory Commission (FERC). The federal license may contain certain conditions to adequately protect, mitigate and enhance beneficial public uses. In issuing the federal license, FERC has a duty to ensure that the project is best adapted to the Basin Plan [(i.e., the Water Quality Control Plan for the North Coast Region)]. (16 U.S.C.A. § 803(a); see also 40 C.F.R. § 2.19 [the Basin Plan is part of California's comprehensive plan for the orderly and coordinated control, protection, conservation, development and utilization of the water resources of the state, and has been submitted for filing pursuant to . . . FERC . . . regulations].)

". . . The United States Supreme Court has ruled that the Federal Power Act preempts state law. The state may not require a permit for a project already licensed by FERC except for proprietary rights to water. (See *First Iowa Hydro-Electric Cooperative v. FPC* [(1946)] 328 U.S. 152 [90 L.Ed. 1143, 66 S.Ct. 906] . . . ; *California v. FERC* [(1990)] 495 U.S. 490 [109 L.Ed.2d 474, 110 S.Ct. 2024] . . . ; *Sayles Hydro [Assn.]* v. *Maughan* [(9th Cir. 1993)] 985 F.2d 451 . . . .) Accordingly, the Regional Water Board cannot effectively require PacifiCorp to submit a ROWD and/or issue WDRs for the Copco and Iron Gate facilities, as requested by Petitioners." (Board res. No. R1-2007-0028.)

The Board's resolution also makes it clear that plaintiffs were attempting to halt discharges of an algae called *Microcystis aeruginosa* that produces a toxin called microcystin, which together are causing adverse consequences contrary to the Board's Basin Plan for the Klamath River. The resolution further recites that the Board is cooperating with the Oregon Department of Environmental Quality and the federal Environmental Protection Agency to formulate "Total Maximum Daily Loads" to address these discharges. One of PacifiCorp's filings before the Board identifies three species of protected fish in the California stretches of the Klamath River.

In August 2007, plaintiffs filed a petition in superior court for either administrative or traditional mandate directing the Board to set aside the resolution and reconsider the issue in light of the trial court determining that there was no federal preemption. Plaintiffs alleged that the resolution was "invalid" because it was "based . . . on the erroneous legal ground that [the Board's] authority to require reports of waste discharge or issue waste discharge requirements pursuant to the Porter-Cologne Act is preempted by the Federal Power Act." Plaintiffs also prayed for an award of attorney fees under section 1021.5.

The position of the Board and PacifiCorp was that federal preemption under the FPA was conclusively established by two decisions of the United States Supreme Court, *First Iowa Coop. v. Power Comm'n., supra,* 328 U.S. 152 (*First Iowa*), and *California v. FERC, supra,* 495 U.S. 490, and a subsequent decision by the Ninth Circuit, *Sayles Hydro Assn. v. Maughan, supra,* 985 F.2d 451 (*Sayles Hydro*).

Plaintiffs contended that these decisions were not dispositive because they did not address the authorization of enforcing state power laws such as Porter-Cologne enacted by Congress in the Federal Water Pollution Control Act, commonly known as the Clean Water Act. (33 U.S.C. § 1251 et seq.; see fn. 17 and accompanying text, *post;* see also *Friends of Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.* (2000) 528 U.S. 167, 174 [145 L.Ed.2d 610, 120 S.Ct. 693].)

Rather than issuing a flat order to the Board to enforce Porter-Cologne, as plaintiffs wanted, or denying the petition, as sought by the Board and PacifiCorp, the trial court apparently decided on a third option not suggested by any of the parties. Noting that all sides had cited a pair of United States Supreme Court decisions subsequent to *California v. FERC* that gave an expansive reading to state power under the Clean Water Act (*S. D. Warren Co. v. Maine Bd. of Environmental Protection* (2006) 547 U.S. 370, 386 [164 L.Ed.2d 625, 126 S.Ct. 1843] (*S.D. Warren*); *PUD No. 1 of Jefferson Cty. v. Washington Dept. of Ecology* (1994) 511 U.S. 700 [128 L.Ed.2d 716, 114 S.Ct. 1900] (*PUD No. 1*)), the court decided to return the matter to the Board in order that it could "give a more complete response to [plaintiffs] as to the reasoning involved" in the Board's decision. Specifically, the court apparently thought the Board had not sufficiently considered the relationship of the Clean Water Act enunciated in these two decisions to federal authority under the FPA.

After reviewing the parties' trial briefs and hearing argument, the trial court issued what appears to have been an alternative writ of mandate directing the Board to revisit the issue. In its judgment of June 2008 directing issuance of

the writ, the trial court stated that it was reserving "jurisdiction over [plaintiffs'] recovery of reasonable attorney fees and costs to be determined on noticed motion."[5] In August, plaintiffs filed a motion requesting attorney fees of $218,206.98 under section 1021.5 from the Board and PacifiCorp, "jointly and severally."

The following month the Board responded to the writ with a 12-page "Supplemental Analysis To Accompany Resolution No. R1-2007-0028" that the court treated as a return that "complies with this court's Writ of Mandate." The gist of the analysis was that, under the FPA and the Clean Water Act as construed in *S.D. Warren* and *PUD No. 1*, the opportunity of a

---

[5] The operative language of the court's "Judgment Granting Petition For Writ Of Mandate" reads in pertinent part: "A peremptory writ of mandamus shall issue commanding [Board] . . . to reconsider petitioners' February 20, 2007 petition and make a determination, consistent with this court's ruling, whether the Porter-Cologne Water Quality Control Act, Water Code § 13000 *et seq.*, is preempted by the Federal Power Act, 16 U.S.C. § 793a *et seq.*, in light of all the relevant law, including the Clean Water Act, the recent United States Supreme Court cases applying state law to hydroelectric projects and the cases stating that the FPA preempts state law."

Although designated as peremptory, the writ appears more characteristic of an alternative writ. As previously mentioned, plaintiffs sought both forms of the writ of mandate, and both traditional and administrative mandate allow for the alternative writ. (Code Civ. Proc., § 1087; Cal. Civil Writ Practice (Cont.Ed.Bar 4th ed. 2009) § 9.2 et seq.; Cal. Administrative Mandamus (Cont.Ed.Bar 3d ed. 2010) § 11.42 et seq.) Issuance of either form of an alternative writ can, as occurred here, follow a hearing in the trial court. (Cal. Civil Writ Practice, *supra*, § 9.4, pp. 216–217; 8 Witkin, Cal. Procedure (5th ed. 2008) Extraordinary Writs, § 185, p. 1090, both citing *Patterson v. Board of Supervisors* (1947) 79 Cal.App.2d 670, 672 [180 P.2d 945].) Returning the matter to the Board was very much like a remand, a step common in administrative mandate proceedings prior to entry of a final judgment (see Code Civ. Proc., § 1094.5, subd. (e); Cal. Administrative Mandamus, *supra*, § 14.27 et seq.), and not itself appealable. (*Village Trailer Park, Inc. v. Santa Monica Rent Control Bd.* (2002) 101 Cal.App.4th 1133, 1139–1140 [124 Cal.Rptr.2d 857].) This interpretation is consistent with the trial court deciding to grant plaintiffs' petition only "in part."

Moreover, the subsequent conduct of the parties, and of the trial court, indicates that they did not accept the designation of the writ as conclusive as to its nature. Neither the Board nor PacifiCorp appealed from the judgment directing issuance of the writ, which did not grant plaintiffs the ultimate form of relief they desired, namely, a judicial order to the Board directing it to apply state law, and thus did not meet the statutory definition of a final judgment. (See Code Civ. Proc., §§ 577, 1064.) Given the terms of the writ directing the Board to "reconsider" its denial of plaintiffs' petition, it is not surprising that none of the parties, or the court, subsequently suggested that the Board's reconsideration of the issue was contrary to the terms of the writ or otherwise inappropriate. The court's subsequent decision to accept the Board's decision following the reconsideration ordered by the court as a "return" to the writ also suggests that the writ was intended as interlocutory. (See Code Civ. Proc. §§ 1089, 1094; Cal. Civil Writ Practice, *supra*, § 9.48 et seq.)

Finally, the subsequent judgment from which plaintiffs appealed "discharged" the writ issued to the Board, which is a feature of finality in writ practice. (See *Hadley v. Superior Court* (1972) 29 Cal.App.3d 389, 394 [105 Cal.Rptr. 500]; Cal. Civil Writ Practice, *supra*, § 9.48, p. 231.)

It is for these reasons that we have characterized the writ issued by the trial court as an alternative writ that was intended as merely an interim measure of relief.

state to implement its water quality law was substantial but only in the context of federal licensing procedures.[6]

---

[6] As the Board explained in the supplemental analysis: "Under section 401 of the Clean Water Act, water quality certification by the state is required for any activity requiring a federal license or permit, which may result in any discharge to surface waters. (33 U.S.C. § 1341.) . . . In issuing water quality certification, the state may impose conditions on a federal project or a project required to obtain a federal permit, in order to certify that the project protects beneficial uses and meets water quality objectives as specified in the Basin Plan."

Elaborating, the Board reasoned that "section 401 of the Clean Water Act gives the states broad powers over FERC licensed hydroelectric projects, including the power to impose additional conditions or even veto the licensing or relicensing of project subject to FERC licensing. (33 U.S.C. §§ 1341(a) ['No license shall be granted if certification is denied.'], 1341(d) ['Any certification provided under this section . . . shall become a condition on any Federal license or permit subject to the provisions of this section.'].) At first blush, this might seem inconsistent with *California v. FERC* and *Sayles Hydro*, which held that the Federal Power Act preempts state authority to deny, impose additional conditions of operation, or even request additional information of FERC licensees based on water quality or other environmental concerns. But there are two important differences between 401 certification authority and the state permitting requirements at issue in *California v. FERC* and *Sayles Hydro*.

"First, the water quality certification requirements of section 401 of the Clean Water Act are established under federal law . . . . [W]here a federal law incorporates state requirements, it makes those requirements federal requirements. For purposes of federal preemption analysis, the substantive requirements of state law applied through the water quality certification analysis become requirements of federal law . . . . [¶] Second, states exercise water quality certification authority in connection with the FERC licensing process. In this regard, conditions of certification are like the recommendations a state agency may make to FERC as part of the FERC licensing process . . . . If a state agency recommends conditions of approval based on what state law would require if the state agency had authority to apply state law and FERC accepts those recommendations and adopts them as conditions of the FERC license, the licensing process has effectively applied state substantive law requirements to the FERC licensee. A water quality certification is similar, except that the state's conditions are not mere recommendations—they are binding on FERC. With both non-binding recommendations accepted by FERC and binding certifications, the state's environmental requirements apply to the licensee through the FERC licensing process and as conditions of the FERC license."

After summarizing *PUD No. 1* and *S.D. Warren*, the Board concluded: "State water quality certification authority over FERC licensed hydroelectric projects is broad substantively but subject to relatively narrow procedural limitations governing how and when that authority may be exercised. The state has broad authority to deny or condition certification based on federal or state water quality requirements. But the state only has an opportunity to deny or condition certification in connection with the FERC licensing process, which occurs only when the original license is issued, the project is relicensed, or the licensee applies for a FERC license amendment. And the state must exercise that authority through the certification process. The initiation of a FERC relicensing proceeding provides authority for the state to apply its water quality certification requirements; it does not lift the Federal Power Act preemption that applies to independent state law permitting requirements like WDR or environmental requirements for water right permitting."

Moreover, the Board made clear that it fully intended to exercise this authority: "As authorized by section 401 of the Clean Water Act, the State Water Board will apply appropriate state water quality requirements as part of its decision to issue or deny water quality certification, and the State Water Board's action will be applied to the Klamath Hydroelectric Project through the [pending] FERC licensing proceeding . . . ." It may be pertinent to note

Plaintiffs attacked the Board's supplemental analysis as mere "wordsmithing" of a single part of resolution No. R1-2007-0028, not the complete de novo reconsideration ordered by the court, and submitted that the Board was simply reiterating its position that it was powerless to act. Plaintiffs requested the court to amend its judgment and vacate the Board's supplemental analysis in addition to the original resolution because both were "based on the . . . Board's incorrect conclusion that the FPA preempts the field of water quality regulation." At a brief hearing conducted on November 12, 2008, plaintiffs argued that the Board's latest action "teed up [the] challenge" to the trial court "so . . . we can get Your Honor to reopen the decision . . . via the return to decide the merits" of the preemption issue.

On December 8, 2008, the court entered a "Judgment Discharging Petition For Writ Of Mandate" in which it concluded: "In light of all the relevant law, including the Clean Water Act, the two recent United States Supreme Court cases upholding state water quality certification requirements for hydroelectric projects under Clean Water Act § 401 [(i.e., *PUD No. 1* and *S.D. Warren*)], and the cases stating that the Federal Power Act preempts state water quality permitting requirements, Respondent [Board] was correct to determine that PacifiCorp is not required to submit a Report of Waste Discharge and/or issue Waste Discharge Requirements for the Copco and Iron Gate facilities." Plaintiffs appealed from the judgment (A124351).

Thereafter the court granted plaintiffs $138,250 in attorney fees under section 1021.5, with the Board and PacifiCorp each liable for half of this sum. The court concluded that the litigation had resulted in an important public benefit, in the form of "a well-reasoned determination" by the Board "as to whether California or federal law should apply to FERC projects with regard to Reports of Waste Discharge and Water Discharge Requirements." The Board and PacifiCorp commenced separate appeals from the fee order (A124369, A124370). We ordered the three appeals consolidated.[7]

---

that at one point counsel for the Board advised the trial court that plaintiffs "are very much involved in the 401 process." Plaintiffs' counsel did not dispute the accuracy of this statement.

The Board also noted that, its additional analysis notwithstanding, "No amendment to the original Resolution is required."

[7] During the pendency of these appeals, the Secretary of the Interior announced a tentative agreement that looks to the closure and removal of four of the facilities comprising the Klamath Hydroelectric Project, including the dam-reservoirs that are the focus of this litigation. The signatories to this agreement include Oregon, California, the federal government, PacifiCorp, and all of the plaintiffs except Klamath Riverkeeper. However, because the dams are not set to be decommissioned until 2020, it seems unlikely that a decision on the merits of these appeals can be avoided on the theory that the controversy is moot. The matter of decommissioning the facilities is additionally pertinent because it may be plaintiffs' ultimate aim. In their petition to the Board, plaintiffs mention that one of the measures the Board could consider in enforcing Porter-Cologne was "the decommissioning and dismantling of the . . . dams."

## DISCUSSION

### The Board Correctly Determined That It Had No
### Authority to Grant the Relief Sought by Plaintiffs

In *Calif. Oregon Power Co. v. Superior Court* (1955) 45 Cal.2d 858 [291 P.2d 455] (*Calif. Oregon Power*), the State of California instituted a nuisance action against the existing Copco facilities and the planned Iron Gate facility, then owned by PacifiCorp's predecessor in interest. (See fn. 1, *ante*.) The Supreme Court agreed with the trial court that the action did not have to be dismissed because, among other reasons, exclusive jurisdiction over the dams and their operation was vested in federal hands, specifically the Federal Power Commission (FPC) administering the FPA.[8] After quoting extensively from *First Iowa, supra*, 328 U.S. 152 and other federal decisions, our Supreme Court held: "Implicit in the foregoing opinions is the concept that the field is not exclusively occupied for all purposes by the Federal Power Act or the federal commission [(i.e., the FPC)]. There is a duality of control the extent of which is not specified. While it is clear the state laws may not 'veto' projects licensed by the federal commission nor may the giving of a license be made contingent on the state's consent, that is, the state may not block the project completely, there is nothing therein indicating that regulatory state laws which do not achieve that end are not proper. There is nothing said about nuisances or danger to the public in the Federal Power Act . . . . Here we are concerned with the abatement of a nuisance, in a sense a local police measure. The federal commission has not purported to adjudicate that question or do anything about it except to have [the power company] apply for a license for its dams, Copco 1 and 2, which for many years it has maintained without any effort to obtain a license and the [FPC] has done nothing in regard to the problem. . . . The state has not even asked in the action that defendant cease operating its dams; it asks that they be so

---

[8] Effective October 1, 1977, a number of the functions of the FPC were transferred to the newly created FERC, including "the investigation, issuance, transfer, renewal, revocation, and enforcement of licenses and permits for the construction, operation, and maintenance of dams, water conduits, reservoirs, powerhouses, transmission lines, or other works for the development and improvement of navigation and for the development and utilization of power across, along, from, or in navigable waters under . . . the Federal Power Act [(16 U.S.C.A. § 791a et seq.)]." (Pub.L. No. 95-91, 91 Stat. 584, adding 42 U.S.C. § 7172(a)(1)(A); see also 10 C.F.R. § 1000.1 (2005).) An admirably concise history of the FPA—beginning with the first congressional bill dealing with dams in 1906 leading to enactment of the Federal Water Power Act in 1920—and its judicial construction up to 1984, may be found in Whittaker, *The Federal Power Act and Hydropower Development: Rediscovering State Regulatory Powers and Responsibilities* (1986) 10 Harv. Env. L.Rev. 135. The provisions of the 1920 act (Pub.L. No. 66-280, 41 Stat. 1063) were incorporated into the Federal Power Act of 1935 (Pub.L. No. 74-333, 49 Stat. 838). Further changes were added by the Electric Consumers Protection Act of 1986 (Pub.L. No. 99-495, 100 Stat. 1243). The FPA is currently codified at 16 United States Code sections 791a–828c.

operated as to not create the danger to the public and the destruction of the fish." (*Calif. Oregon Power, supra*, 45 Cal.2d 858, 868–869.)

Plaintiffs stake everything on *Calif. Oregon Power*, which they deem "binding." To them, the Board's refusal to follow this decision amounts to an "abdication of its authority under State law," specifically, Porter-Cologne, which "provide[s] a mechanism for the State of California to abate nuisances resulting from water pollution" and thereby "regulate water quality problems." As plaintiffs see it, according to established preemption principles and *Calif. Oregon Power*, the Board, and the trial court, failed to recognize that "Congress did not evince an intention, either expressly or implicitly, to occupy the field of *water quality regulation* pursuant to the FPA. . . . Congress did intend to comprehensively address water quality regulation in enacting the Clean Water Act. Although the FPA preempts some of the State's authority to regulate *water flow* through a federally-licensed hydropower facility, such preemption does not extend to the State's authority to regulate *pollution releases* to California's rivers." For plaintiffs, "There is no principled distinction between the California Supreme Court's [*Calif. Oregon Power*] ruling allowing a public nuisance action to proceed in the face of the FPA and the question before this Court as to whether the Regional Board should be allowed to proceed pursuant to its authority and duty to implement Porter-Cologne."

Plaintiffs' emphasis upon "water flow" and "pollution releases" is an attempt to differentiate their suit from, and break free from the gravitational pull of, two federal decisions, the one by the United States Supreme Court in *California v. FERC, supra*, 495 U.S. 490, and the one by the Ninth Circuit Court of Appeals in *Sayles Hydro, supra*, 985 F.2d 451. This approach does credit to their counsel's ingenuity, but it is ultimately unavailing. Understanding why requires some history.

"It is no longer open to question that the Federal Government under the Commerce Clause . . . has dominion, to the exclusion of the States, over navigable waters of the United States. [(Citing, inter alia, *First Iowa, supra*, 328 U.S. 152.)] Congress has elected to exercise this power under the detailed and comprehensive plan for the development of the Nation's water resources, which it prescribed in the Federal Power Act, to be administered by the Federal Power Commission. *First Iowa Hydro-Electric Cooperative v. Federal Power Comm'n . . . .*" (*City of Tacoma v. Taxpayers* (1958) 357 U.S. 320, 334 [2 L.Ed.2d 1345, 78 S.Ct. 1209], fn. omitted, citations omitted.) *First Iowa* is central to understanding the scope of federal preemption.

There, the FPC was willing to approve a pending application for development of a hydroelectric project on the Cedar River, but the State of Iowa

intervened to demand that the applicant first secure a state permit. The United States Supreme Court held that the state demand was preempted by the FPA: "To require the [cooperative] to secure the actual grant to it of a state permit . . . as a condition precedent to securing a federal license for the same project . . . would vest in . . . Iowa a veto power over the federal project. Such a veto power easily could destroy the effectiveness of the Federal Act. It would subordinate to the control of the State the 'comprehensive' planning which the Act provides shall depend upon the judgment of the Federal Power Commission . . . ." (*First Iowa, supra,* 328 U.S. 152, 164.) "A dual final authority, with a duplicate system of state permits and federal licenses required for each project, would be unworkable. 'Compliance with the requirements' of such a duplicated system of licensing would be nearly as bad. Conformity to both standards would be impossible in some cases and probably difficult in most of them." (*Id.* at p. 168.)

■ The court then considered the scope of section 27 of the FPC, which then and now provides: "Nothing contained in this chapter shall be construed as affecting or intending to affect or in any way to interfere with the laws of the respective States relating to the control, appropriation, use, or distribution of water used in irrigation or for municipal or other uses, or any vested right acquired therein." (16 U.S.C. § 821.) The court gave this provision a narrow construction: "The effect of § 27, in protecting state laws from supersedure, is limited to laws as to the control, appropriation, use or distribution of water in irrigation or for municipal or other uses of the same nature. It therefore has primary, if not exclusive, reference to such proprietary rights. The phrase 'any vested right acquired therein' further emphasizes the application of the section to property rights. There is nothing in the paragraph to suggest a broader scope . . . ." (*First Iowa, supra,* 328 U.S. 152, 175–176.)

■ After describing the FPA as "a major undertaking" intended "to secure a comprehensive development of natural resources," the court concluded: "The detailed provisions of the Act providing for the federal plan of regulation *leave no room or need for conflicting state controls.*" (*First Iowa, supra,* 328 U.S. 152, 180–181, italics added.)[9]

Notwithstanding this clear language, some California commentators were reluctant to accept it at face value, while others were openly hostile to the decision. (See Attwater & Markle, *Overview of Cal. Water Rights and Water Quality Law* (1987–1988) 19 Pac. L.J. 957, 990–991 [*First Iowa* "has

___

[9] The court went on to characterize states' " 'control of the waters within their borders' " as " 'subordinate' " and " ' "subject to the acknowledged jurisdiction of the United States under the Constitution in regard to commerce and the navigation of the waters of rivers." ' " (*First Iowa, supra,* 328 U.S. 152, 182, quoting *U.S. v. Appalachian Power Co.* (1940) 311 U.S. 377, 405 [85 L.Ed. 243, 61 S.Ct. 291].)

been perceived as holding that the licensing of a hydroelectric project by the FERC operates to preempt state water rights laws, and that a FERC licensee may divert and use water for hydroelectric purposes without meeting state requirements"]; Walston, *State Regulation of Federally-Licensed Hydropower Projects: The Conflict between* California *and* First Iowa (1990) 43 Okla. L.Rev. 87, 88, 95 ["*First Iowa's* view that the FPA preempts state water laws is no longer persuasive" and "is of doubtful validity"][10]; Comment, *Small Hydroelectric Projects and State Water Rights* (1986–1987) 18 Pac. L.J. 1225, 1236–1237 ["the interpretation of section 27 of the FPA in First Iowa is merely dicta"; "the decision did not resolve whether state water laws are preempted by the FPA"]; see also Plouffe, *Forty Years After* First Iowa: *A Call For Greater State Control of River Resources* (1985–1986) 71 Cornell L.Rev. 833, 848 ["As long as First Iowa remains the law of the land, . . . the states will never have their deserved role in river resource management."].)[11] Four decades later, armed with a different statute's broad reading of state power over interior water resources,[12] California got the opportunity to determine whether *First Iowa* meant what it said.

In 1987, in connection with a federally licensed hydroelectric facility in El Dorado County, the FERC issued a declaratory order to the effect that the Board had no authority to impose more stringent flow requirements for the protection of fish than the FERC's permit allowed. Citing *First Iowa's* veto

[10] At the time he wrote this article, Roderick Walston was a deputy attorney general who was representing California in the pending litigation that led to the United States Supreme Court's decision in *California v. FERC, supra*, 495 U.S. 490, 492.

[11] (For additional criticism of *First Iowa*, see Tarlock, Law of Water Rights and Resources (2009) § 9:22, p. 9-34 ["no excuse for the Court's continued uncritical deference to federal primacy . . . on the mistaken assumption that there is anything comprehensive and balanced about federal water resources policy"]; Comments, *Hydroelectric Power, the Federal Power Act, and State Water Laws: Is Federal Preemption Water Over the Dam?* (1984) 17 U.C. Davis L.Rev. 1179, 1200–1204 [suggesting that the court would back away from a broad reading of *First Iowa* because "the Court appreciates the uniqueness and importance of state water laws, and the need to defer to those laws to promote sound water management, particularly in the arid West"]; Note, *Preemption and Regulatory Efficiency in Federal Energy Statutes* (1989–1990) 103 Harv. L.Rev. 1306, 1311 ["Contrary to the FPA's vision of joint regulation, *First Iowa* needlessly eliminated much state management."].)

[12] California was relying on a provision of the 1902 Reclamation Act which provides: "Nothing in this Act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of this Act, shall proceed in conformity with such laws . . . ." (43 U.S.C. § 383.) California was perhaps emboldened to press for review by the broad construction to state power given this provision in *California v. United States* (1978) 438 U.S. 645 [57 L.Ed.2d 1018, 98 S.Ct. 2985], which the same attorney who argued both cases claimed was the model for section 27 of the FPA. (See Walston, *State Regulation of Federally-Licensed Hydropower Projects: The Conflict between* California *and* First Iowa, *supra*, 43 Okla. L.Rev. 87.)

language, the FERC concluded that "the establishment of minimum flows is a matter beyond the reach of state regulation." (*Rock Creek Limited Partnership* (Mar. 11, 1987) 38 F.E.R.C. ¶ 61,240, p. 61,773.) The Board took the position that it had concurrent jurisdiction with the FERC because "*First Iowa* did not support federal preemption of this issue."[13] (See *State of California ex rel. Water Resources Bd. v. F.E.R.C.* (9th Cir. 1989) 877 F.2d 743, 745.) The Ninth Circuit rebuffed California's petition to overturn the FERC decision. And the Supreme Court unanimously affirmed, rejecting California's attempt to limit *First Iowa* by broadening the scope of state power under section 27 of the FPA.

As soon as the Supreme Court began its analysis it was apparent that California would not carry the day: "The parties' dispute . . . turns principally on the meaning of § 27 of the FPA, which provides the clearest indication of how Congress intended to allocate the regulatory authority of the States and the Federal Government. . . . Were this a case of first impression, petitioner's argument based on the statute's language could be said to present a close question. . . . [¶] But the meaning of § 27 and the pre-emptive effect of the FPA are not matters of first impression. Forty-four years ago, this Court in *First Iowa* construed the section and provided the understanding of the FPA that has since guided the allocation of state and federal regulatory authority over hydroelectric projects." (*California v. FERC, supra*, 495 U.S. 490, 497–498.)

■ After quoting the passage from *First Iowa* confining state power under section 27 of the FPA to "proprietary rights," the court rejected California's invitation to reexamine *First Iowa*: "We decline at this late date to revisit and disturb the understanding of § 27 set forth in *First Iowa*. . . . [P]etitioner requests that we repudiate *First Iowa*'s interpretation of § 27 and the FPA. This argument misconceives the deference this Court must accord to longstanding and well-entrenched decisions, especially those interpreting statutes that underlie complex regulatory regimes. Adherence to precedent is, in the usual case, a cardinal and guiding principle of adjudication, and '[c]onsiderations of *stare decisis* have special force in the area of statutory interpretation, for here, unlike in the context of constitutional interpretation, the legislative power is implicated, and Congress remains free to alter what we have done.' [Citation.] There has been no sufficient intervening change in the law, or indication that *First Iowa* has proved unworkable or has fostered confusion and inconsistency in the law, that warrants our departure from established precedent. [Citation.] This Court has endorsed and applied *First Iowa*'s limited reading of § 27 [citations], and has employed the decision with

---

[13] The Board is statutorily authorized to "take all appropriate proceedings or actions before executive, legislative, or judicial agencies to prevent waste, unreasonable use, unreasonable method of use, or unreasonable method of diversion of water in this state." (Wat. Code, § 275.)

approval in a range of decisions, both addressing the FPA and in other contexts. [Citations.] By directing FERC to consider the recommendations of state wildlife and other regulatory agencies while providing FERC with final authority to establish license conditions (including those with terms inconsistent with the States' recommendations), Congress has amended the FPA to elaborate and reaffirm *First Iowa*'s understanding that the FPA establishes a broad and paramount federal regulatory role. [(Citing 16 U.S.C. § 803(a)(1)–(3) & (j)(1)–(2).)]" (*California v. FERC, supra*, 495 U.S. 490, 498–500.)[14]

"Petitioner asks this Court fundamentally to restructure a highly complex and long-enduring regulatory regime, implicating considerable reliance interests of licensees and other participants in the regulatory process. That departure would be inconsistent with the measured and considered change that marks appropriate adjudication of such statutory issues. [Citation.]" (*California v. FERC, supra*, 495 U.S. 490, 500.)

The court then shot down another attempt by California to differentiate its regulatory authority from *First Iowa*: "Petitioner also argues that we should disregard *First Iowa*'s discussion of § 27 because it was merely dictum. It is true that our immediate concern in *First Iowa* was the interpretation of § 9(b) of the FPA,[15] which governs submission to the federal licensing agency of evidence of compliance with state law. The Court determined that § 9(b) did

---

[14] The court rejected California's litigation strategy (see fn. 12 and accompanying text, *ante*) with the following: "Petitioner also argues that our decision in *California v. United States* . . . construing § 8 of the Reclamation Act of 1902, requires that we abandon *First Iowa*'s interpretation of § 27 and the FPA. Petitioner reasons that § 8 is similar to, and served as a model for, FPA § 27, that this Court in *California v. United States* interpreted § 8 in a manner inconsistent with *First Iowa*'s reading of § 27, and that that reading of § 8, subsequent to *First Iowa*, in some manner overrules or repudiates *First Iowa*'s understanding of § 27. *California v. United States* is cast in broad terms and embodies a conception of the States' regulatory powers in some tension with that set forth in *First Iowa*, but that decision bears quite indirectly, at best, upon interpretation of the FPA. The Court in *California v. United States* interpreted the Reclamation Act of 1902; it did not advert to, or purport to interpret, the FPA, and held simply that § 8 requires the Secretary of the Interior to comply with state laws, not inconsistent with congressional directives, governing use of water employed in federal reclamation projects. [Citation.] Also, as in *First Iowa*, the Court in *California v. United States* examined the purpose, structure, and legislative history of the entire statute before it and employed those sources to construe the statute's saving clause. [Citation.] Those sources indicate, of course, that the FPA envisioned a considerably broader and more active federal oversight role in hydropower development than did the Reclamation Act. [Citations.]" (*California v. FERC, supra*, 495 U.S. 490, 503–504, fn. omitted.)

[15] What in *First Iowa*'s time was section 9(b) of the FPA is now section 9(a), which reads: "(a) Each applicant for a license under this chapter shall submit to the commission—[¶] (2) Satisfactory evidence that the applicant has complied with the requirements of the laws of the State or States within which the proposed project is to be located with respect to bed and banks and to the appropriation, diversion, and use of water for power purposes and with respect to the right to engage in the business of developing, transmitting, and distributing

not require licensees to obtain a state permit or to demonstrate compliance with the state law prerequisites to obtaining such a permit. [Citation.] Instead, the Court construed the section merely as authorizing the federal agency to require evidence of actions consistent with the federal permit. [Citation.] *First Iowa*'s limited reading of § 27 was, however, necessary for, and integral to, that conclusion. . . . The Court reasoned that, absent an express congressional command, § 9(b) could not be read to require compliance with, and thus to preserve, state laws that conflicted with and were otherwise pre-empted by the federal requirements.[16] [Citations.] Only the Court's narrow reading of § 27 allowed it to sustain this interpretation of § 9(b). Had § 27 been given the broader meaning that Iowa sought, it would have 'saved' the state requirements at issue, made the state permit one that could be issued, and supported the interpretation of § 9(b) as requiring evidence of compliance with those state requirements, rather than compliance only with those requirements consistent with the federal license." (*California v. FERC, supra*, 495 U.S. 490, 500–502, fn. omitted.) By "saved," the court made explicit that it was referring to "an interpretation of § 9(b) that would have . . . accommodated the state permit system and its underlying requirements." (*Id.* at p. 502.) *First Iowa* had therefore "rejected the possibility of concurrent jurisdiction." (*Ibid.*)

The court then administered the coup de grâce: "Adhering to *First Iowa*'s interpretation of § 27, we conclude that the California requirements for minimum in-stream flows cannot be given effect and allowed to supplement the federal flow requirements. . . . As Congress directed in FPA § 10(a), FERC set the conditions of the license, including the minimum stream flow, after considering which requirements would best protect wildlife and ensure that the project would be economically feasible, and thus further power development. [Citations.] Allowing California to impose significantly higher minimum stream flow requirements would disturb and conflict with the balance embodied in that considered federal agency determination. FERC has indicated that the California requirements interfere with its comprehensive planning authority, and we agree that allowing California to impose the challenged requirements would be contrary to congressional intent regarding the Commission's licensing authority and would 'constitute a veto of the project that was approved and licensed by the FERC.' [*State of California ex rel. Water Resources Bd. v. F.E.R.C., supra,*] 877 F.2d, at 749; cf. *First Iowa, supra*, at 164–165." (*California v. FERC, supra*, 495 U.S. 490, 506–507.)

---

power, and in any other business necessary to effect the purposes of a license under this chapter." (16 U.S.C. § 802, quoted in *California v. FERC, supra*, 495 U.S. 490, 500–501, fn. 1.)

[16] At this point the court cited to where the *First Iowa* court stated: "If a state permit is not required, there is no justification for requiring the petitioner, as a condition of securing its federal permit, to present evidence of the petitioner's compliance with the requirements of the State Code for a state permit." (*First Iowa, supra*, 328 U.S. 152, 166–167.)

Undaunted, California tried another tack in *Sayles Hydro*. The subject there was the proposed construction and operation of a hydroelectric facility on the American River in El Dorado County. After almost a decade of controversy attending the project (see *LaFlamme v. F.E.R.C.* (9th Cir. 1991) 945 F.2d 1124), the FERC granted it a license. When the project proponents filed an application for a state water permit, the Board insisted that an environmental impact report had to be prepared before the Board would consider the application. The proponents filed suit in federal district court, and obtained a declaratory judgment and an injunction against the Board, on the ground that federal authority occupied the field of licensing and regulating hydroelectric power facilities, leaving to the state only the power to determine proprietary water rights. The Board's appeal failed before the Ninth Circuit. (*Sayles Hydro, supra*, 985 F.2d 451.)

■ The court's analysis was brief, almost abrupt. It opened by dismissing the Board's reliance on section 27 of the FPA: "We cannot . . . construe this statute on a blank slate. The Supreme Court has read the broadest possible negative pregnant into this 'savings clause.' [(Citing *First Iowa, supra*, 328 U.S. 152, 176.)] The rights reserved to the states in this provision are all the states get. The State Board before us in this case has litigated this very matter before the United States Supreme Court and lost. [(Citing *California v. FERC, supra*, 495 U.S. 490.)] [¶] *First Iowa* involved circumstances similar to the instant case. The Federal Power Commission wanted the project to proceed, but the State of Iowa did not, unless the power cooperative first demonstrated compliance with Iowa law regarding pollution, fish protection, construction, diversion of streams, and other requirements. The diversion of a river, prohibited by state law, was the exact means selected by the Federal Power Commission to generate a maximum amount of electricity. The Supreme Court held that the state and federal authorities do not 'share in the final decision of the same issue.' [(Quoting *First Iowa, supra*, at p. 168.)]" (*Sayles Hydro, supra*, 985 F.2d 451, 454.)

"The language of *First Iowa* was broad, but its facts arguably left room to treat its construction of [section 27] as dictum, because that case involved a conflict between state and federal requirements. The State Board proposed this reading to the Supreme Court in *California v. FERC* . . . . The Court rejected it. [Citation.] The Court read the ratio decidendi of *First Iowa* as necessarily construing the savings provision 'to encompass only laws relating to proprietary rights.' [Citation.] The Court held that the California minimum stream flow requirement did not reflect proprietary rights in water, so, under *First Iowa*, federal preemption barred the state regulation." (*Sayles Hydro, supra*, 985 F.2d 451, 455.) "*California v. FERC* reaffirms *First Iowa*'s narrow interpretation of the savings provision, so that the only authority states get over federal power projects relates to allocating proprietary rights in water. *First Iowa* said that the separation of authority between state and federal

governments 'does not require two agencies to share in the final decision of the same issue.' [(Quoting *First Iowa, supra,* 328 U.S. 152, 167–168.)] *California v. FERC* reaffirms *First Iowa,* uses the 'occupy the field' characterization 'broad and paramount federal regulatory role,' [(quoting *California v. FERC, supra,* 495 U.S. 490, 499)], and plainly states that 'constricting § 27 to encompass only laws relating to proprietary rights' accomplishes this 'no sharing' purpose. [(Quoting *id.* at pp. 502–503.)]" (*Sayles Hydro, supra,* at pp. 455–456, fn. omitted.)

And so there be no possible doubt about its reasoning, the court then reiterated: "In the case at bar, it is clear that the federal laws have occupied the field, preventing state regulation. This conclusion is strengthened by the fact that most or all of the State Board's concerns were considered by the Federal Energy Regulatory Commission in granting the license, and conditions were imposed in the license to protect these multiple values. . . . There would be no point in Congress requiring the federal agency to consider the state agency recommendations on environmental matters and make its own decisions about which to accept, if the state agencies had the power to impose the requirements themselves." (*Sayles Hydro, supra,* 985 F.2d 451, 456.)

The court closed its opinion with a chilling warning: "Sayles has suggested that the appeal is frivolous and deserves sanctions. We have not gone so far as this, though the Board's unwillingness to accept the meaning of the result it obtained in *California v. FERC* gives us pause. Further litigation which appears to the District Court to be frivolous or for purposes of delay may expose the litigants or their attorneys to sanctions." (*Sayles Hydro, supra,* 985 F.2d 451, 456.)

Thus, twice has the United States Supreme Court, followed by the Ninth Circuit, in the most expansive terms, validated expansive federal authority over the conditions governing operation of hydroelectric projects. These are the commanding heights that plaintiffs have decided to charge.

Plaintiffs do not really discuss *First Iowa, California v. FERC,* or *Sayles Hydro* except to dismiss them. Their approach is to note these decisions but claim they are not at all controlling. Plaintiffs purport to distinguish them on the ground that none of them unambiguously holds that "the FPA preempts states' water quality laws." Plaintiffs reason that not one of the federal decisions addressed the states' role under the Clean Water Act, enacted in 1972, long after *First Iowa* was decided (33 U.S.C. § 1251 et seq.; No. Pub.L. No. 92-500, 86 Stat. 816), which has a number of provisions permitting—that is, not preempting—state laws devoted to preserving water

quality.[17] Nor do plaintiffs follow the lead of the trial court in focusing upon *PUD No. 1* and *S.D. Warren*, which are mentioned at only three points in their opening brief.

It is true, as plaintiffs point out, that Porter-Cologne gives the Board the authority and responsibility to abate nuisances affecting the state's water resources. (See Wat. Code, §§ 13050, subds. (h) & (m), 13225, 13241, 13263, subd. (a), 13340, 13377.) But these statutes, individually or when considered with *Calif. Oregon Power, supra,* 45 Cal.2d 858, cannot overcome *First Iowa, California v. FERC,* and *Sayles Hydro.*

It is also true that none of these federal court decisions expressly considered the federal Clean Water Act, the provisions of Porter-Cologne, or *Calif. Oregon Power.* Therefore, according to a strict application of stare decisis, they do not amount to an express refutation of plaintiffs' thesis. (E.g., *Goldstein v. Superior Court* (2008) 45 Cal.4th 218, 236 [85 Cal.Rptr.3d 313, 195 P.3d 588] (conc. opn. of Moreno, J.) [" 'it is axiomatic that cases are not authority for propositions not considered' "].) Nevertheless, the spirit of those decisions cannot be dismissed out of hand on that basis. Nor are they without impact upon our analysis.

*Sayles Hydro* interpreted *First Iowa* and *California v. FERC* as "field preemption" decisions, that is, with the exception of their proprietary water rights, states are excluded from interposing their law into the field of hydropower regulation. (*Sayles Hydro, supra,* 985 F.2d 451, 455–456.) This

---

[17] "It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources, and to consult with the Administrator [of the Environmental Protection Agency] in the exercise of his authority under this chapter." (33 U.S.C. § 1251(b).)

"Any applicant for a Federal license or permit to conduct any activity including, but not limited to, the construction or operation of facilities, which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate, . . . that any such discharge will comply with the applicable provisions of sections 1311, 1312, 1313, 1316, and 1317 of this title. . . ." (33 U.S.C. § 1341(a).)

"[N]othing in this chapter shall (1) preclude or deny the right of any State or political subdivision thereof or interstate agency to adopt or enforce (A) any standard or limitation respecting discharges of pollutants, or (B) any requirement respecting control or abatement of pollution; except that if an effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of performance is in effect under this chapter, such State or political subdivision or interstate agency may not adopt or enforce any effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of performance which is less stringent than the effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of performance under this chapter; or (2) be construed as impairing or in any manner affecting any right or jurisdiction of the States with respect to the waters (including boundary waters) of such States." (33 U.S.C. § 1370.)

is not literally true, because, as the Supreme Court observed in *California v. FERC*, the FPA does allow states to have input in the form of "recommendations" to FERC during the licensing process. (*California v. FERC, supra*, 495 U.S. 490, 498–499, citing 16 U.S.C. § 803(a)(1)–(3), (j)(1)–(2).) But that is the extent of the collaboration allowed by the language of the FPA.

■ Although, as a state court, we are not bound by the Ninth Circuit's construction of the FPA in *Sayles Hydro*, that construction may be considered. (E.g., *People v. Zapien* (1993) 4 Cal.4th 929, 989 [17 Cal.Rptr.2d 122, 846 P.2d 704] [" 'Decisions of the lower federal courts interpreting federal law, although persuasive, are not binding on state courts.' "].) In this instance, we agree with *Sayles Hydro* and its reading of *First Iowa* and *California v. FERC*. And we *are* bound by decisions of the United States Supreme Court in the construction and application of federal law. (E.g., *Chesapeake & Ohio Ry. v. Martin* (1931) 283 U.S. 209, 220–221 [75 L.Ed. 983, 51 S.Ct. 453]; *Stock v. Plunkett* (1919) 181 Cal. 193, 194–195 [183 P. 657]; 9 Witkin, Cal. Procedure, *supra*, Appeal, § 505, p. 568.)

One of the most subtle and original legal thinkers once analogized the strength of a precedent to cosmology: "We are not now, and probably never will be, able to predict the path of a precedent with absolute certainty. No more can we always, with complete assurance, predict the path of a merely physical object. But at least we know that information about the weight of the object and its direction and velocity at a given point would be relevant to our prediction. So, too, we know something about the relevant factors in plotting the path of a precedent. We know that the line of motion of any precedent is subjected to a special pull that skews it whenever it passes near a point of high value tension." (Cohen, *Field Theory and Judicial Logic* (1949–1950) 59 Yale L.J. 238, 249.) Here, we know what that tension point is—and we have proof from a most unusual source.

The brief of the Attorney General on behalf of the Board contains the following extraordinary admission: "In the interests of candor, the Regional Board will admit at the outset to a certain sense of déjà vu when reviewing the arguments being offered here by the appellants. That is because very similar arguments, seeking a very similar result, were attempted by the State of California on behalf of the State Water Resources Control Board . . . in two federal cases . . . . Unfortunately, the first of those cases resulted in a ruling by a unanimous United States Supreme Court rejecting California's arguments, the very contentions being attempted again by the [plaintiffs] here. The second of those cases was a later opinion by the Ninth Circuit Court of Appeals, which not only again rejected the arguments being offered by the State in support of its arguments for concurrent enforcement of state permit laws against a federally licensed dam, but also ended with the suggestion that

sanctions might be considered if any similar arguments were attempted in the future. This clear and unequivocal Supreme Court and Ninth Circuit case authority notwithstanding, the plaintiffs have now returned [*sic*] to this Court offering the same arguments but hoping for an opposite result."[18] These are unmistakable references to *California v. FERC* and *Sayles Hydro*.

This is no ordinary concession by a party to litigation, but a considered view by an administrative agency of the statutes under which it operates. The Board's view of its lack of authority to enforce California's water laws as to hydroelectric facilities operating pursuant to federal license would in any case be entitled to at least respectful attention. (E.g., *Colmenares v. Braemar Country Club, Inc.* (2003) 29 Cal.4th 1019, 1029 [130 Cal.Rptr.2d 662, 63 P.3d 220] [administrative agency's construction given "substantial weight"]; *Harrott v. County of Kings* (2001) 25 Cal.4th 1138, 1154–1155 [108 Cal.Rptr.2d 445, 25 P.3d 649] ["great weight"]; *Dix v. Superior Court* (1991) 53 Cal.3d 442, 460 [279 Cal.Rptr. 834, 807 P.2d 1063] ["great deference"]; *People v. Woodhead* (1987) 43 Cal.3d 1002, 1013 [239 Cal.Rptr. 656, 741 P.2d 154] ["respect"]; *State Building & Construction Trades Council of California v. Duncan* (2008) 162 Cal.App.4th 289, 304 [76 Cal.Rptr.3d 507] [agency view "may be helpful"].) "The amount of deference given to the administrative construction depends ' "upon *the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade,*

---

[18] Counsel for the Board expressed the same opinion to the trial court, providing some vivid corroborating detail:

"Listening to Mr. Lozeau [counsel for plaintiffs] gives me a real sense of déjà vu. These concerns he's expressing and what's motivating the argument here, I think, were exactly the concerns that motivated us when we went . . . to the United States Supreme Court in *California v. FERC*.

"We were arguing in that case exactly for this sort of parallel regulatory authority to be—that would sort of be on parallel tracks with the federal process. We wanted that.

"We went to the Supreme Court with the support of the 49 other states [as] amicus. I don't think it's ever happened before.

"And when our guys got there to argue, Rod Walston from our office, he stood up and he was feeling very good about his prospects. And one of the first things that happened was that Justice Stevens looked down from the bench and said, Well, I see you're here with the support of all 49 of the states. And Walston said, that's true Your Honor. And then Stevens said: In that case you shouldn't have any trouble going across town to Congress and getting the law changed. And it went down hill from there.

"Justice O'Connor wrote a unanimous decision basically rejecting the same arguments you're hearing today. We tried it again in *Hydro Sayles* in the 9th Circuit. It was in *Sayles Hydro* that the Court again affirmed [*sic*] *First Iowa* and . . . *California v. FERC*, and it also made the point that we're talking about . . . .

"And as a final little twist, at the end of that opinion, they actually at least pondered the prospect of . . . . imposing sanctions on our office for even making these arguments again, after *California v. FERC*. So we've been there. We've done that. We've got the scar tissue to prove it, but the law is what it is."

*if lacking power to control."* ' " (*Hoechst Celanese Corp. v. Franchise Tax Bd.* (2001) 25 Cal.4th 508, 524 [106 Cal.Rptr.2d 548, 22 P.3d 324], quoting *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 14–15 [78 Cal.Rptr.2d 1, 960 P.2d 1031].)

The special factor undergirding the Board's admission is the failed history of its efforts to vindicate the very power plaintiffs would have the Board ordered to wield. The Board has the scars to prove that it has been down this road already, and more than once. The interest it tried and failed to protect—regulation of California's own waters—is an interest to which no state is indifferent.

California, like most Western states, has long appreciated the importance of water. "The present and future well-being and prosperity of the state depend upon the conservation of its life-giving waters. . . . The conservation of other natural resources is of importance, but the conservation of waters of the state is of transcendent importance. Its waters are the very life blood of its existence."[19] (*Gin S. Chow v. City of Santa Barbara* (1933) 217 Cal. 673, 701–702 [22 P.2d 5]; see *Ivanhoe Irr. Dist v. All Parties* (1957) 47 Cal.2d 597, 621 [306 P.2d 824] ["It was early realized that water in this semiarid region was of utmost importance to the welfare, progress and prosperity of the people of the state."], revd. on other grounds *sub nom. Ivanhoe Irrig. Dist v. McCracken* (1958) 357 U.S. 275 [2 L.Ed.2d 1313, 78 S.Ct. 1174]; *Joerger v. Pacific Gas & Electric Co.* (1929) 207 Cal. 8, 22 [276 P. 1017] ["It is . . . the policy of the state to require the highest and greatest public duty from the waters of the state in the interest of agriculture and other useful and beneficial purposes."]; *Cucamonga County Water Dist. v. Southwest Water Co.* (1971) 22 Cal.App.3d 245, 259 [99 Cal.Rptr. 557] [noting the "special importance attached to efficient and economical use and distribution of water in the arid western states"].) Porter-Cologne codifies the Legislature's recognition of these interests. (Wat. Code, § 13000.) More recently, recreation has become accepted as having equal importance. (See Cal. Const., art. X, § 4; *Marks v. Whitney* (1971) 6 Cal.3d 251, 257, 259 [98 Cal.Rptr. 790, 491 P.2d 374]; *Kern River Public Access Com. v. City of Bakersfield* (1985) 170 Cal.App.3d 1205, 1214–1216 & fn. 4 [217 Cal.Rptr. 125].)

When the matter of a state's water resources becomes the subject of a state-federal dispute, it would be hard to identify a more vital state interest. It follows that when that interest has twice been subordinated to sweeping federal authority in the form of the FPA, there is no "skew" because the

---

[19] This language was most recently quoted by our Supreme Court in *Joslin v. Marin Mun. Water Dist.* (1967) 67 Cal.2d 132, 140, footnote 9 [60 Cal.Rptr. 377, 429 P.2d 889], and by this court in *Brydon v. East Bay Mun. Utility Dist.* (1994) 24 Cal.App.4th 178, 203 [29 Cal.Rptr.2d 128].

federal interest prevails even in the presence of the "high value tension" of traditional state power. (Cohen, *Field Theory and Judicial Logic, supra*, 59 Yale L.J. 238, 249.) It is hardly credible that when it decided *California v. FERC* the Supreme Court was unaware of the vital interest of states in regulating their water resources, particularly in regard to the most populous state in the union.[20]

The power of the federal precedents, particularly *First Iowa* and *California v. FERC*, have a clear and undeviating potency. This explains the Board's submission and gives it unusual persuasive force. It is also corroborated by logical inference. Even the attorney for the Board who unsuccessfully argued to preserve the state's power in *California v. FERC*, although originally not reconciled to the decision, came to accept the principle that California's "regulatory laws do not apply to hydropower projects." (Walston, *Cal. Water Law: Historical Origins to the Present* (2008) 29 Whittier L.Rev. 765, 788; see Walston, California v. Federal Energy Regulatory Commission: *New Roadblock to State Water Rights Administration* (1991) 21 Envtl. L. 89, 110 [criticizing *California v. FERC* as "fail[ing] to consider and apply the broad historical and policy themes that have persuaded the Court in other recent federal-state water cases to recognize broad state authority"].[21])

---

[20] In addition to the fact that all 50 states made their views known to the Supreme Court (see fn. 18, *ante*), certain members of the court could be expected to have a personal sensitivity to this interest. Justice O'Connor, the author of the unanimous opinion in *California v. FERC*, is from Arizona, as was Chief Justice Rehnquist; Justice Kennedy is a Californian; and Justice White came from Colorado. All of these states are members of the Colorado River Compact, and the amount of water the states were, and are, entitled to draw from the river was an issue of burning importance that spawned one of the longest-running legal disputes in our country's history. (See *Arizona v. California* (1931) 283 U.S. 423 [75 L.Ed. 1154, 51 S.Ct. 522]; *Arizona v. California* (1934) 292 U.S. 341 [78 L.Ed. 1298, 54 S.Ct. 735]; *Arizona v. California* (1936) 298 U.S. 558 [80 L.Ed. 1331, 56 S.Ct. 848]; *Arizona v. California* (1963) 373 U.S. 546 [10 L.Ed.2d 542, 83 S.Ct. 1468]; *Arizona v. California* (1964) 376 U.S. 340 [11 L.Ed.2d 757, 84 S.Ct. 755]; *Arizona v. California* (1966) 383 U.S. 268 [15 L.Ed.2d 743, 86 S.Ct. 924]; *Arizona v. California* (1979) 439 U.S. 419 [58 L.Ed.2d 627, 99 S.Ct. 995]; *Arizona v. California* (1983) 460 U.S. 605 [75 L.Ed.2d 318, 103 S.Ct. 1382]; *Arizona v. California* (1984) 466 U.S. 144 [80 L.Ed.2d 194, 104 S.Ct. 1900]; *Arizona v. California* (2000) 530 U.S. 392 [147 L.Ed.2d 374, 120 S.Ct. 2304]; *Arizona v. California* (2000) 531 U.S. 1 [148 L.Ed.2d 1, 121 S.Ct. 292]; *Arizona v. California* (2006) 547 U.S. 150 [164 L.Ed.2d 271, 126 S.Ct. 1543].) In addition, the source of the Mississippi River is in Minnesota, the home state of Justice Blackmun, and the river constitutes the entire western boundary of Illinois, where Justice Stevens was born and raised.

[21] It may be noteworthy that in the period between authoring these articles, Mr. Walston had seen things from the other side, having left the Department of Justice in California to serve in the Department of the Interior in Washington, eventually becoming its acting solicitor. (See Walston, *California Water Law: Historical Origins to the Present, supra*, 29 Whittier L.Rev. 765, fn. 1.)

In both *First Iowa* and *California v. FERC*, the judicial tone is emphatic in declaring the broadest scope to federal supremacy in the field of regulating hydropower projects, retaining to the states only the limited matter of "proprietary rights." It is true that plaintiffs are relying on a number of provisions in the Clean Water Act (see fn. 17, *ante*) which, considered in the abstract, might support their contention, and which were not expressly considered in either decision. But such statutory isolation is not possible. The obvious import of the Clean Water Act provisions upon which plaintiffs rely seem indistinguishable both in tone and in perceived import from the provision in the Reclamation Act that underlay California's futile attempt to breach the wall erected by *First Iowa*. (See fn. 12 and accompanying text, *ante*.)

The remaining arguments plaintiffs advance to avert this conclusion are unavailing. Plaintiffs invoke the principle that courts presume that Congress did not intend to preempt the states' power over traditional subjects of regulatory authority, including water quality. However, in *California v. FERC* the Supreme Court explicitly held that this principle is not operative vis-à-vis the FPA. (*California v. FERC, supra*, 495 U.S. 490, 497–498.)

Nor can our Supreme Court's decision in *Calif. Oregon Power, supra*, 45 Cal.2d 858, be used to sustain plaintiffs' argument that "There is no principled distinction between the California Supreme Court's . . . ruling allowing a public nuisance action to proceed in the face of the FPA and . . . whether the Regional Board should be allowed to proceed pursuant to its authority and duty to implement Porter-Cologne." In point of fact, there are several distinctions.

First, *Calif. Oregon Power* did not consider Porter-Cologne because that measure was not enacted until 14 years later (Stats. 1969, ch. 482, § 18, p. 1051). So, the decision cannot qualify as binding authority concerning that measure. (*Goldstein v. Superior Court, supra,* 45 Cal.4th 218, 228.)

Second, the *Calif. Oregon Power* court made a point of noting that the facilities at issue were not operating pursuant to an FPC license. (*Calif. Oregon Power, supra*, 45 Cal.2d 858, 861.) It is thus factually distinguishable from the situation here, where it is undisputed that at all relevant times the facilities operated by PacifiCorp have been licensed by the FERC. (See fn. 2 and accompanying text, *ante*.)

Third, the court read *First Iowa* as not occupying the field of hydropower regulation. (*Calif. Oregon Power, supra*, 45 Cal.2d 858, 868–869 ["Implicit in the foregoing opinions is the concept that the field is not exclusively occupied for all purposes by the Federal Power Act or the federal commission."].) This estimation is clearly no longer tenable after *California v. FERC*.

*Calif. Oregon Power* cannot be viewed in isolation from consideration of subsequent federal decisions, which are either independently persuasive—as in the case of the Ninth Circuit's construction of the FPA in *Sayles Hydro*—or which are themselves superior to *Calif. Oregon Power*—as in the case of *California v. FERC*. Because the point is ultimately one of how federal law is construed, the state Supreme Court's construction cannot overcome a contrary interpretation by the United States Supreme Court. (*Chesapeake & Ohio Ry. v. Martin, supra*, 283 U.S. 209, 220–221; *Stock v. Plunkett, supra*, 181 Cal. 193, 194–195.)

Fourth, it appears that the utility of *Calif. Oregon Power* to plaintiffs may have been eroded by subsequent decisions of the United States Supreme Court. In *International Paper Co. v. Ouellette* (1987) 479 U.S. 481 [93 L.Ed.2d 883, 107 S.Ct. 805], Vermont property owners sued to halt pollution discharged into Lake Champlain by a paper company located in New York as an alleged nuisance under Vermont common law. The court held that the Clean Water Act preempted the action, and that the only law applicable to an interstate state discharge was "the law of the State in which the point source [of the pollution] is located." (479 U.S. at p. 487.) The court reiterated this holding in *Arkansas v. Oklahoma* (1992) 503 U.S. 91 [117 L.Ed.2d 239, 112 S.Ct. 1046], concluding that downsource victims of pollution could not claim the assistance of federal common law when the upstream polluter had a discharge permit issued by the Environmental Protection Agency. Thus, if the pollution of which plaintiffs complain has its source in Klamath facilities in Oregon, especially if they have an Environmental Protection Agency-issued permit, *Calif. Oregon Power* cannot be treated as controlling. However, neither of these possibilities is established by the record before us. We mention them simply to underscore that, with respect to a 55-year-old decision antedating enactment of the Clean Water Act, as well as *California v. FERC* and *Sayles Hydro*, there are legitimate and obvious grounds for questioning whether it states an eternal verity.

Fifth, the preemption of state authority under the FPA that has been accepted by the Board is in line with the approach courts have taken subsequent to *California v. FERC* and *Sayles Hydro*. Our research has discovered only two subsequent decisions which resemble the general outlines of this case: *Hackett v. J.L.G. Properties, LLC* (2008) 285 Conn. 498 [940 A.2d 769] (*Hackett*) and *Wisconsin Valley Improvement Co. v. Meyer* (W.D.Wis. 1996) 910 F.Supp. 1375 (*Meyer*). In *Hackett*, the Supreme Court of Connecticut held that the FPA preempted enforcement of municipal zoning laws as to a commercial marina situated on a reservoir generating hydroelectric power pursuant to a FERC license. The court held that that the construction given section 27 of the FPA by *First Iowa* and *California v. FERC* "is not limited to water flow issues, but is instructive on all matters in which states seek to impose requirements on hydroelectric power projects." (*Hackett,*

*supra,* at p. 777.) *Sayles Hydro* was cited for its determination of congressional intent "to occupy the field and create a 'broad and paramount federal regulatory role . . . .' " (*Hackett, supra,* at p. 778.) And in *Meyer,* a federal district considered a claim that the FPA preempted a state statute characterized as "authoriz[ing] the Wisconsin Department of Natural Resources to impose fees on applicants for hydropower licenses to cover the costs of the studies the department conducts to determine the environmental impact of proposed hydroelectric projects." (*Meyer, supra,* at p. 1377.) The court concluded that the state statute was preempted: "Although the Wisconsin statute is directed only to the payment of the cost of studies . . . it adds another requirement and an additional cost to the securing of a license. Having to pay fees to the state to cover the costs of such studies may deter a hydropower company from developing its project in the state of Wisconsin. . . . To that extent, [the state statute] functions as an economic deterrent to license applicants and can be construed as an implicit 'veto power' by the state similar to laws requiring applicants to meet more stringent state requirements than those provided by the federal licensing scheme." (*Id.* at pp. 1382–1383.)[22]

Plaintiffs urge us to start at square one, applying the standard preemption criteria, and determine whether Congress intended an exclusive federal occupation of the field of hydropower regulation. They contend that such an

---

[22] Our reading of the import of *First Iowa, California v. FERC,* and *Sayles Hydro* is also in accord with the one reported California decision considering the issue of FPA preemption. (See *County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 958–960 [91 Cal.Rptr.2d 66].)

There is also an unpublished 2007 opinion by federal district court Judge William Alsup in litigation that is of more than passing interest to these appeals. The litigation was initiated against PacifiCorp by Klamath Riverkeeper, individuals affiliated with the Karuk Tribe, and a director of the Pacific Coast Federation of Fishermen's Associations, to halt discharge from the Copco and Iron Gate dams of *microcystis aeruginosa* and microsystin, the same toxins plaintiffs sought to have regulated by the Board (see fn. 4, *ante*) alleged to be a California nuisance. Judge Alsup dismissed the complaint on the ground that it was preempted by the FPA, as construed in *First Iowa, California v. FERC,* and *Sayles.* The following excerpt of Judge Alsup's opinion is particularly pertinent: "Plaintiffs contend that the instant case is different from *Sayles Hydro, First Iowa,* and *California v. FERC* because those decisions involved a state agency trying to usurp federal authority. Plaintiffs' argument lacks merit. None of those binding decisions indicated that their holdings should be limited to instances where a state agency, rather than a private individual, was attempting to impede the federal regulatory scheme. What those decisions held was that *any* state law or regulation that 'would be an obstacle to the accomplishment of the full purposes of the objectives of Congress in authorizing the Federal Energy Regulatory Commission to license the project to proceed' should be prohibited. *Sayles Hydro,* 985 F.2d at 456. That plaintiffs here are private individuals rather than a public agency does not render those decisions inapposite." (*McConnell v. PacifiCorp Inc.* (N.D.Cal., Aug. 17, 2007, No. C 07-02382 WHA) 2007 WL 2385096, p. *5.)

Parenthetically, we observe Judge Alsup's opinion was filed on August 17, 2007. It was not appealed. Plaintiffs commenced this action on August 23, 2007. The reader can draw the obvious conclusion.

analysis will demonstrate that the Clean Water Act was not meant to oust state power, and that the FPA was not meant to ignore what plaintiffs characterize as "state water quality protection laws." But the court in *California v. FERC* declined a similar invitation when it refused to revisit the soundness of *First Iowa*. We think this a sound precedent to follow. And we mean precedent in both its literal and figurative senses.

It is literally true because in *California v. FERC* the Supreme Court reiterated *First Iowa*'s conclusion that the FPA occupies the field of hydropower regulation (*California v. FERC, supra,* 495 U.S. 490, 499, 506), and, to reiterate once again, we are not at liberty to ignore that conclusion. (*Chesapeake & Ohio Ry. v. Martin, supra,* 283 U.S. 209, 220–221; *Stock v. Plunkett, supra,* 181 Cal. 193, 194–195.) Even were we not strictly obliged by stare decisis to follow the two decisions by the United States Supreme Court, we would still choose to do so.

Justice Brandeis famously said that "*Stare decisis* is usually the wise policy, because in most matters it is more important that the applicable rule of law be settled than that it be settled right" (*Burnet v. Coronado Oil & Gas Co.* (1932) 285 U.S. 393, 406 [76 L.Ed. 815, 52 S.Ct. 443] (dis. opn. of Brandeis, J.)), a principle invoked by the court in *California v. FERC, supra,* 495 U.S. 490, 500. Translated to the vernacular, this means "Enough is enough." And at some point, it has to mean "Knock it off."

The Board eventually reached the latter conclusion, halting its efforts to get around FPA preemption. Plaintiffs have now taken up the standard for state power, bringing up the same policy and prudential arguments federal and state courts have uniformly rejected when advanced by the Board. But when the United States Supreme Court unanimously holds that "the FPA establishes *a broad and paramount federal . . . role*" (*California v. FERC, supra,* 495 U.S. 490, 499, italics added), that conclusion should be afforded a respect that goes beyond what is strictly demanded by stare decisis. The court there noted that its earlier opinion in *First Iowa* had subsequently been "employed . . . with approval in a range of decisions, both addressing the FPA and in other contexts." (*Ibid.*) Allowing for its shorter existence, so too it has proven with *California v. FERC*. (See *John R. Sand & Gravel Co. v. United States* (2008) 552 U.S. 130, 139 [169 L.Ed.2d 591, 128 S.Ct. 750]; *PUD No. 1, supra,* 511 U.S. 700, 720–722; *Maislin Industries, U. S. v. Primary Steel* (1990) 497 U.S. 116, 131, 135 [111 L.Ed.2d 94, 110 S.Ct. 2759].)

■ A determination of federal preemption does not automatically mean that state input is categorically prohibited and state opinion of no consequence. The Clean Water Act gives states what appears to be a very substantial role by requiring that an applicant for any federal license comply

with state water quality procedures. (See fn. 17, *ante*; *S.D. Warren, supra*, 547 U.S. 370, 386; *PUD No. 1, supra*, 511 U.S. 700, 707, 713.) But the crucial points are (1) that it is Congress that determines what is the extent of state input, and (2) that input takes place within the context of FERC licensing procedures as specified in the FPA. It is only when states attempt to act outside of this *federal* context and this *federal* statutory scheme under authority of independent state law that such collateral assertions of state power are nullified. All of these points were acknowledged by the Board in its supplemental analysis. (See fn. 6 and accompanying text, *ante*.)

"Rivers mean different things to different people. Rivers are home and habitat to fish and wildlife. They are a means both of transportation and of waste disposal. They can be a source of spiritual regeneration. They can also be a source of power production. They provide life and they can take it away. [¶] Given the multitude of expectations associated with rivers and the institutional structures that have developed to fulfill those expectations, conflict is inevitable." (Sherk, *Approaching a Gordian Knot: The Ongoing State/Federal Conflict Over Hydropower* (1996) 31 Land & Water L.Rev. 349, 350.) So it has proved.

■ California has long appreciated the nonpareil importance of its internal waters. (See, e.g., *Ivanhoe Irr. Dist v. All Parties, supra*, 47 Cal.2d 597, 621; *Gin S. Chow v. City of Santa Barbara, supra*, 217 Cal. 673, 701–702; *Joerger v. Pacific Gas & Electric Co., supra*, 207 Cal. 8, 22.) The state and the Board appear to have done their utmost in trying to keep as much power as possible in California's hands. But their efforts met only defeat. The FPA has established "a highly complex and long-enduring regulatory regime." (*California v. FERC, supra*, 495 U.S. 490, 500.)[23] Reasonable minds might disagree as to the wisdom of entrusting the subject to federal supremacy, but the reality of that decision is no longer open to debate. (*Chesapeake & Ohio Ry. v. Martin, supra*, 283 U.S. 209, 220–221; *Stock v. Plunkett, supra*, 181 Cal. 193, 194–195.) The trial court correctly determined that it should not compel the Board to upset this long-settled applecart.

### The Trial Court Abused Its Discretion in Granting the Request for Attorney Fees Pursuant to Section 1021.5

The trial court decided to return the matter to the Board in order that it could "give a more complete response to [plaintiffs] as to the reasoning involved" in the Board's decision. Specifically, the court apparently thought

---

[23] Our Supreme Court has expressed a similar thought: "The scope and technical complexity of issues concerning water resource management are unequalled by virtually any other type of activity presented to the courts." (*Environmental Defense Fund, Inc. v. East Bay Mun. Utility Dist.* (1977) 20 Cal.3d 327, 344 [142 Cal.Rptr. 904, 572 P.2d 1128].)

the Board had not sufficiently considered the United States Supreme Court decisions in *S.D. Warren, supra*, 547 U.S. 370, and *PUD No. 1, supra*, 511 U.S. 700, which considered state power under the Clean Water Act and which were decided after *California v. FERC*.

When it sent the matter back to the Board, the trial court told the Board: "it is insufficient to refuse to grant petitioners' request based solely on the FPA's preemption of state laws; respondent [(i.e., the Board)] must also address the role of state laws through the Clean Water Act and in light of the rulings and rationale of all of the relevant authority, including the two most recent U.S. Supreme Court cases [(i.e., *PUD No. 1* and *S.D. Warren*)]." Prior to doing so, the trial court stated to counsel that "it wouldn't do much harm basically." The court also inquired of counsel for the Board, "I don't see much prejudice in it to the defendants/respondents, do you?" Not having the gift of prescience, counsel was unable to foresee that the court's action would form the basis for its subsequent decision to award plaintiffs over $138,000 in attorney fees.

In the order announcing the award, the trial court reasoned: "Because Respondent [Board] and Real Party in Interest [PacifiCorp] did not include any discussion or rationale for this determination in their opposition to Petitioners' Petition (or attempt to reconcile the U.S. Supreme Court cases that appeared to conflict [i.e., *PUD No. 1* and *S.D. Warren*]), the court must assume that Respondent had not conducted a thoughtful, well-considered analysis of this issue, but simply assumed (as both Respondent and Real Party in Interest stated in their opposition) that Federal law applies because it preempts California law—even though that argument is inconsistent with two recent U.S. Supreme Court cases. Thus the court assumes that it was Petitioner's action in bringing this lawsuit, and the court's granting of their petition and issuance of a writ ordering Respondent to reconsider their decision about the application of RWDs and WDRs, that caused Respondent to make a thoughtful and well-reasoned determination about this issue. Well-reasoned decisions about water quality and waste discharge are an important public benefit." "Though the court understands that Respondent and Real Party In Interest may well feel they are the prevailing parties, nevertheless it is the court's intention to grant attorneys fees to the Petitioners in the amount of $138,250, half of which is to be paid by Respondent and half of which is to be paid by Real Party in Interest."[24]

---

[24] The court's language about its "intention," and the absence of any mention of a lodestar, suggest the possibility that this was merely an interlocutory order, which of course would not be appealable. (See 7 Witkin, Cal. Procedure (5th ed. 2008) Judgment, § 12, pp. 555–556; 9 Witkin, Cal. Procedure, *supra*, Appeal, § 136, p. 209.) However, there is no indication in the record that either the court or any of the parties anticipated returning to the subject. Moreover, the order

## The Governing Principles

Section 1021.5 provides in pertinent part: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any. . . ."

■ " 'The Legislature adopted section 1021.5 as a codification of the private attorney general doctrine of attorney fees developed in prior judicial decisions. . . . [T]he private attorney general doctrine "rests upon the recognition that privately initiated lawsuits are often essential to the effectuation of the fundamental public policies embodied in constitutional or statutory provisions, and that, without some mechanism authorizing the award of attorney fees, private actions to enforce such important public policies will as a practical matter frequently be infeasible." Thus, the fundamental objective of the doctrine is to encourage suits enforcing important public policies by providing substantial attorney fees to successful litigants in such cases.' [Citation.]

■ "In order to effectuate that policy, we have taken a broad, pragmatic view of what constitutes a 'successful party.' 'Our prior cases uniformly explain that an attorney fee award may be justified even when the plaintiff's legal action does not result in a favorable final judgment. [Citations.] It is also clear that the procedural device by which a plaintiff seeks to enforce an important right is not determinative of his or her entitlement to attorney fees under section 1021.5. [Citation.] Similarly, a section 1021.5 award is not necessarily barred merely because the plaintiff won the case on a preliminary issue. [Citation.] In determining whether a plaintiff is a successful party for purposes of section 1021.5, "[t]he critical fact is the impact of the action, not the manner of its resolution." [Citation.] [¶] The trial court in its discretion "must realistically assess the litigation and determine, from a practical perspective, whether or not the action served to vindicate an important right so as to justify an attorney fee award" under section 1021.5. [Citation.]' " (*Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 565–566 [21 Cal.Rptr.3d 331, 101 P.3d 140] (*Graham*), quoting *Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1290–1291 [240 Cal.Rptr. 872, 743 P.2d 932] (*Maria P.*).)

does fix the amount of fees and specify how it shall be paid. Finally, all of the parties accept the order as final, and thus appealable. In these circumstances, so have we.

Put another way, courts check to see whether the lawsuit initiated by the plaintiff was "demonstrably influential" in overturning, remedying, or prompting a change in the state of affairs challenged by the lawsuit. (E.g., *Folsom v. Butte County Assn. of Governments* (1982) 32 Cal.3d 668, 687 [186 Cal.Rptr. 589, 652 P.2d 437]; *RiverWatch v. County of San Diego Dept. of Environmental Health* (2009) 175 Cal.App.4th 768, 783 [96 Cal.Rptr.3d 362]; *Lyons v. Chinese Hospital Assn.* (2006) 136 Cal.App.4th 1331, 1346, fn. 9 [39 Cal.Rptr.3d 550].) " 'Entitlement to fees under [section] 1021.5 is based on the impact of the case as a whole.' " (*Punsly v. Ho* (2003) 105 Cal.App.4th 102, 114 [129 Cal.Rptr.2d 89], quoting what is now Pearl, Cal. Attorney Fee Awards (Cont.Ed.Bar 2d ed. 2008) § 4.11, p. 100.) As for what constitutes a "significant benefit," it "may be conceptual or doctrinal, and need not be actual and concrete, so long as the public is primarily benefited." (*Planned Parenthood v. Aakhus* (1993) 14 Cal.App.4th 162, 171 [17 Cal.Rptr.2d 510].)

Thus, a trial court which grants an application for attorney fees under section 1021.5 has made a practical and realistic assessment of the litigation and determined that (1) the applicant was a successful party, (2) in an action that resulted in (a) enforcement of an important right affecting the public interest and (b) a significant benefit to the general public or a large class of persons, and (3) the necessity and financial burden of private enforcement of the important right make an award of fees appropriate. " 'On review of an award of attorney fees . . . the normal standard of review is abuse of discretion. However, de novo review of such a trial court order is warranted where the determination of whether the criteria for an award of attorney fees . . . have been satisfied amounts to statutory construction and a question of law.' "[25] (*Connerly v. State Personnel Bd.* (2006) 37 Cal.4th 1169, 1175 [39 Cal.Rptr.3d 788, 129 P.3d 1], quoting *Carver v. Chevron U.S.A., Inc.* (2002) 97 Cal.App.4th 132, 142 [118 Cal.Rptr.2d 569].)

---

[25] Case law is replete with recitals that attorney fee awards are ordinarily reviewed according to the deferential abuse of discretion standard. (E.g., *Graham, supra,* 34 Cal.4th 553, 578; *Press v. Lucky Stores, Inc.* (1983) 34 Cal.3d 311, 317 [193 Cal.Rptr. 900, 667 P.2d 704]; *Westside Community for Independent Living, Inc. v. Obledo* (1983) 33 Cal.3d 348, 355 [188 Cal.Rptr. 873, 657 P.2d 365] (*Westside Community*).) However, as this court has repeatedly noted, " ' "Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an 'abuse' of discretion." ' " (*Thayer v. Wells Fargo Bank* (2001) 92 Cal.App.4th 819, 833 [112 Cal.Rptr.2d 284]; see *Lealao v. Beneficial California, Inc.* (2000) 82 Cal.App.4th 19, 25 [97 Cal.Rptr.2d 797].) Acting contrary to specific statutory command, or applying an incorrect legal standard, is accepted as proof of discretion abused. (E.g., *DVD Copy Control Assn., Inc. v. Bunner* (2003) 31 Cal.4th 864, 890 [4 Cal.Rptr.3d 69, 75 P.3d 1]; *Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1134, fn. 18 [26 Cal.Rptr.2d 231, 864 P.2d 502]; *Fasuyi v. Permatex, Inc.* (2008) 167 Cal.App.4th 681, 695–696 [84 Cal.Rptr.3d 351].)

### Plaintiffs Did Not Qualify As "Successful Parties" Who Caused the "Enforcement of an Important Right Affecting the Public Interest" and Thereby "Conferred a Significant Benefit on the General Public"

The Board and PacifiCorp contend that the trial court was legally incorrect in determining that plaintiffs qualified as successful parties who had enforced an important right that resulted in a significant benefit to the public. Because the trial court misapplied, as a matter of law, the statutory criteria of section 1021.5, the Board and PacifiCorp argue that no informed exercise of discretion occurred, and thus no deference is due under the lenient abuse standard. We agree that, however the trial court's decision is characterized, and regardless of which standard of review is applied, the award made by the trial court is too flawed to survive.

■ " ' "The appropriate benchmarks in determining which party prevailed are (a) the situation immediately prior to the commencement of suit, and (b) the situation today, and the role, if any, played by the litigation in effecting any changes between the two." ' [Citation.] . . . ' "[P]laintiffs may be considered 'prevailing parties' for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." ' [Citation.]" (*Maria P., supra,* 43 Cal.3d 1281, 1291–1292.)

The Board and PacifiCorp hit the obvious points. The relief sought by plaintiffs was (1) a determination by the trial court that the Board was legally wrong as to the enforceability of Porter-Cologne in the face of the FPA, and (2) a peremptory writ of mandate compelling the Board to abandon its nonenforcement of Porter-Cologne. Neither objective was ever achieved. The only relief—using the term in the broadest sense—obtained by plaintiff was the limited remand to the Board, and that was not something sought by plaintiffs, but appears to have been the brainchild of the trial court. There is no answer to the Board's statement that plaintiffs "can point to no meaningful success whatever in this action," an absence eloquently demonstrated by plaintiffs' appeal from the judgment "in which they are challenging the trial court's ruling against them on all issues."

Plaintiffs insist they did prevail: "Here, the Karuk were the successful party, having obtained a final judgment and writ of mandate in their favor requiring the Regional Board to set aside the portions of Resolution R1-2007-0028 that the Karuk Tribe challenged and to reconsider those

portions in light of the applicable federal law. This outcome secured essentially all of the relief sought by the Karuk Tribe . . . . The order obtained by the Karuk Tribe ensured that the Regional Board did not arbitrarily and without sufficient explanation forego its statutory duties to protect water quality and provided the trial court—for the first time—a reviewable basis of the Regional Board's decision that federal hydropower law preempts the fundamental California water quality law. Thus, the action meets the criteria of section 1021.5 in that it has 'contributed in a significant way' to vindicating an important public right that the Regional Board not arbitrarily disavow its duty to protect California's water quality and wildlife resources. In doing so, the Karuk Tribe conferred a substantial benefit on the public."

Plaintiffs characterize their litigation as intended only "to cure the Regional Board's flawed preemption analysis in Resolution No. R1-2007-0028." They see themselves as vindicating "the public's right to ensure that governmental agencies follow the letter of the law," as well as the public's "important right to challenge arbitrary decisions by the Regional Board, including those rendered arbitrary its failure to explain its reasoning." "By forcing the Board to reconsider its Resolution, this case resulted in the enforcement of important public rights affecting the public interest and conferred significant benefits on the public by ensuring the proper review of decisions before the Board and the effectuation of fundamental statutory policy, including careful analysis by the Regional Board before disavowing its critical role under Porter-Cologne to protect the water quality of the Klamath River . . . ."

Plaintiffs' attempt to recast the purpose, scope, and outcome of the litigation is completely unpersuasive. The cold hard reality, from a practical assessment, is that plaintiffs lost.

 Before plaintiffs commenced this litigation, the Board declined to enforce Porter-Cologne against the Klamath River dams on the ground that, as to the matter of water quality, federal authority was supreme and exclusive. When this litigation ended, the Board was still declining to enforce Porter-Cologne. Again, to quote the Board, "the final result of [plaintiffs'] efforts before the trial court were to change nothing, and those efforts had no impact on the Board's position as it existed when the action was first filed." The only difference was that the Board now had the concurrence of the trial court. If " ' "the critical fact is the impact of the action" ' " (*Graham, supra*, 34 Cal.4th 553, 566), that impact can only be described as nil. "[I]n order to justify a fee award, there must be a causal connection between the lawsuit

and the relief obtained" (*Westside Community, supra,* 33 Cal.3d 348, 353) or "a change in the defendant's conduct" (*Urbaniak v. Newton* (1993) 19 Cal.App.4th 1837, 1842 [24 Cal.Rptr.2d 333]). But here there was neither genuine relief obtained by plaintiffs nor change by the Board. Any realistic assessment of this litigation from a practical perspective based on the impact of the case as a whole (see *Graham, supra,* at p. 566; *Punsly v. Ho, supra,* 105 Cal.App.4th 102, 111) can come to no other conclusion.

California accepts that " ' "plaintiffs may be considered 'prevailing parties' for attorney's fees purposes if they succeed on *any significant issue* in litigation which achieves some of the benefit *the parties sought* in bringing suit." ' " (*Maria P., supra,* 43 Cal.3d 1281, 1292, italics added, quoting *Hensley v. Eckerhart* (1983) 461 U.S. 424, 433 [76 L.Ed.2d 40, 103 S.Ct. 1933]; accord, *Graciano v. Robinson Ford Sales, Inc.* (2006) 144 Cal.App.4th 140, 153 [50 Cal.Rptr.3d 273].) The only relief/achievement/success from this litigation was the remand to the Board. However, it was not a significant issue—indeed, it was no issue—and it certainly was not sought by plaintiffs, but was engineered by the trial court for its own reasons. Nowhere in plaintiffs' petition is there a hint that they wanted a fuller explanation from the Board supporting its conclusion that it was powerless against the FPA. The Clean Water Act is mentioned, but there is no allegation that the Board had failed to give it adequate consideration. To hear plaintiffs tell it, all they sought was the Board's reconsideration with fuller examination of the Clean Water Act, or as plaintiffs otherwise recast it, their litigation merely seeking to have the Board polish up and augment its decision, crossing a few more t's and dotting a few extra i's, showing that all analytical bases were touched on the way to concluding that plaintiffs' request was barred by reason of the FPA's preemptive effect. And having received that, it satisfied the goal of their litigation. This argument borders on the preposterous.

Leaving to one side plaintiffs' understandable but questionable characterization of the writ issued as a final judgment (see fn. 5, *ante*), we cannot agree that it "secured essentially all the relief" they sought. Their position does not account for plaintiffs renewing their attack on the Board's reconsidered decision that it was preempted by federal law. If indeed a fuller explanation was all plaintiffs sought, their appeal from the ultimate judgment is inexplicable. And a review of their petition leaves no doubt that plaintiffs' goal was not to overturn resolution No. R1-2007-0028 because it was procedurally flawed, but because it was substantively wrong.[26] As plaintiffs

---

[26] "Respondent Regional Board's refusal to apply the Water Code's waste discharge requirements to Real Party In Interest PacifiCorp is based on an incorrect legal conclusion that the State of California's water quality laws as they apply to PacifiCorp's operations on the Klamath River are preempted by the Federal Power Act, 16 U.S.C. § 793a *et seq.* . . . Respondent's denial of Petitioner's petition erred as a matter of law in concluding that

admit in their respondents' brief on the appeal from the fee order, they still maintain that the Board's second denial is "incorrect."

That plaintiffs do not qualify as successful parties can be demonstrated at a more elemental level, while also establishing that they do not satisfy two of the other criteria for an award of fees under section 1021.5.

The Board does admit that, at best, the trial court's remand corrected " 'no more than a procedural defect' " or " 'a minute blemish.' " (Quoting *Balch Enterprises, Inc. v. New Haven Unified School Dist.* (1990) 219 Cal.App.3d 783, 795 [268 Cal.Rptr. 543], and *Concerned Citizens of La Habra v. City of La Habra* (2005) 131 Cal.App.4th 329, 335 [31 Cal.Rptr.3d 599].) PacifiCorp calls it a "limited procedural achievement" involving only "a purely technical and procedural matter." However, even these modest characterizations are overgenerous.

As previously mentioned, plaintiffs' request to the Board that it enforce Porter-Cologne was denied by resolution No. R1-2007-0028. The resolution is seven pages in length and has 27 paragraphs preceding this decision: "Petitioners' request to require PacifiCorp to submit a ROWD for Copco and Iron Gate Dams is DECLINED . . . ."[27]

---

Respondent's authority to require reports of waste discharge, issue waste discharge requirements or otherwise enforce the requirements of the Porter-Cologne Act are preempted by the Federal Power Act." "Respondent's decision . . . is invalid under Code of Civil Procedure § 1094.5, in that Respondent committed a prejudicial abuse of discretion by failing to proceed in the manner required by law. Respondent failed to proceed in the manner required by law by rejecting Petitioner's request to act based substantially on the erroneous legal ground that Respondent's authority to require reports of waste discharge or issue waste discharge requirements pursuant to the Porter-Cologne Act is preempted by the Federal Power Act." In their brief to the trial court, plaintiffs reiterated that it was "asking the Court to overrule the Regional Board's flawed legal interpretation of the FPA" and "to correct the Regional Board's fundamental legal error."

[27] In the second of the 27 paragraphs the Board recited that "This item does not constitute an adjudicatory hearing and does not result in any action taken toward any party. This Resolution is informational only, and is not intended to bind PacifiCorp or any public agency with jurisdiction over PacifiCorp." (Board res. No. R1-2007-0028, ¶ 2.) Given that the Board was not acting in an adjudicatory capacity, its denial of plaintiffs' request would be redressable only in traditional mandate (see *Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 520–521 [80 Cal.Rptr.3d 28, 187 P.3d 888]; Cal. Administrative Mandamus, *supra*, § 1.1, p. 2), which will issue to correct a refusal to follow the law or to comply with statutory commands (e.g., *Lockyer v. City and County of San Francisco* (2004) 33 Cal.4th 1055, 1107–1109 & fn. 35 [17 Cal.Rptr.3d 225, 95 P.3d 459]; *Salinger v. Jordan* (1964) 61 Cal.2d 824, 827 [40 Cal.Rptr. 361, 395 P.2d 49]).

However, a careful examination of the statutes governing the state and the regional water resources control boards[28] and their operations has uncovered nothing that requires such a decision by the WRCB to be in a particular form.[29] This encompasses the statutes concerning the WRCB's functioning either in general (Wat. Code, §§ 174–188.5, 1050–1124), or in enforcing Porter-Cologne (Wat. Code, §§ 13200–13228.15), as well as the implementing regulations (Cal. Code Regs., tit. 23, §§ 647–649.6). Concerning any "action or failure," the WRCB is expected to a issue only a "decision or order" (Wat. Code, §§ 13320, 1120, 1121, 1122, 1123, 1124, 1831),[30] which is subject to judicial review via an aggrieved party's petition for a writ of mandate (Wat. Code, §§ 1126, 13330). There is no directive that there must be "written findings," an obligation found in various other codes and contexts. (E.g., Ed. Code, §§ 17250.20, 81702; Fish & G. Code, §§ 219, 2118.2; Food & Agr. Code, §§ 14023, 33264; Gov. Code, §§ 15606, 51133, 56810;

---

[28] In this part of our discussion, WRCB refers to the state and the regional water resources control boards.

[29] We posed this question to counsel at oral argument. Counsel for plaintiffs and the WRCB both cited only *Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506 [113 Cal.Rptr. 836, 522 P.2d 12]. There, our Supreme Court noted that implicit in the language used by Code of Civil Procedure section 1094.5 "is a requirement that the agency which renders the challenged decision must set forth findings to bridge the analytic gap between the raw evidence and ultimate decision or order. If the Legislature had desired otherwise, it could have declared as a possible basis for issuing [administrative] mandamus the absence of substantial evidence to support the administrative agency's action. By focusing, instead, upon the relationships between evidence and findings and between findings and ultimate action, the Legislature sought to direct the reviewing court's attention to the analytic route the administrative agency traveled from evidence to action. In so doing, we believe that the Legislature must have contemplated that the agency would reveal this route. Reference, in section 1094.5, to the reviewing court's duty to compare the evidence and ultimate decision to '*the* findings' (italics added) we believe leaves no room for the conclusion that the Legislature would have been content to have a reviewing court speculate as to the administrative agency's basis for decision." (11 Cal.3d at p. 515.) The court also commented that requiring findings "serve a public relations function by helping to persuade the parties that administrative decision-making is careful, reasoned, and equitable." (*Id.* at p. 517.) We agree that this is probably what the trial court had in mind.

Although the precise issue in *Topanga* was zoning variances granted by local agencies, the court clearly indicated that its discussion also applied to state administrative agencies. (See *Topanga Assn. for a Scenic Community v. County of Los Angeles, supra*, 11 Cal.3d 506, 514, fn. 12 [noting "clear desire that section 1094.5 apply to all agencies . . . regardless of their state or local character"].) Nevertheless, the context for these statements was *evidentiary* findings made during an *adjudicatory* decision. (See also *id.* at pp. 512, fn. 8, 515, 518.) The contents of resolution No. R1-2007-0028 and the supplemental analysis give no basis for concluding that the WRCB was deciding contested evidentiary issues. Quite the contrary, the portions of both quoted throughout this opinion deal only with purely legal issues. Moreover, as noted, the WRCB expressly noted that it was not acting in an adjudicatory capacity (see fn. 27, *ante*), and therefore Code of Civil Procedure section 1094.5 would not apply.

[30] There are occasional references in the Water Code to a "decision *and* order" by the WRCB (Wat. Code, §§ 13228.14, 13321, italics added), but there appears to be no significance to this variation.

Harb. & Nav. Code, § 86; Health & Saf. Code, §§ 33363, 39661; Ins. Code, §§ 1861.05, 1861.16; Pen. Code, § 2910.5; Pub. Resources Code, §§ 2774.4, 21080, 21104.2; Pub. Util. Code, §§ 783, 25815; Rev. & Tax. Code, § 254.6; Wat. Code, § 1813.)[31]

This undermines the entire basis for the trial court's returning the matter to the WRCB. If the WRCB had no obligation to explain the basis for its action, it follows that it had no obligation to provide a more detailed explanation. Contrary to plaintiffs' argument, there was nothing "arbitrary" in the WRCB's actions because the WRCB had no obligation "to explain its reasoning."[32] Generating the additional reasoning by the WRCB addressing the Clean Water Act, *PUD No. 1* and *S.D. Warren*—all of which were already cited in resolution No. R1-2007-0028—was not a " ' "significant issue . . . [plaintiffs] sought in bringing suit." ' " (*Maria P., supra*, 43 Cal.3d 1281, 1292.) And while the subject of water quality undoubtedly amounts to " 'an important right affecting the public interest,' " in no sense did plaintiffs cause it to be "enforced" because there was no change in the WRCB's position. (*Westside Community, supra*, 33 Cal.3d 348, 352.) Providing that augmented explanation does not, as the trial court concluded, qualify as a "significant benefit" worth $138,000 to the people of California. (*Planned Parenthood v. Aakhus, supra*, 14 Cal.App.4th 162, 171.)

We have exercised our independent review because, as a matter of law, plaintiffs satisfied none of the requisites for an award of attorney fees under section 1021.5. (*Connerly v. State Personnel Bd., supra*, 37 Cal.4th 1169, 1175.) From a realistic appreciation of the entirety of this litigation, plaintiffs did not prevail on a significant issue and thus do not qualify as successful parties. They also did not enforce an important public right. Finally, what plaintiffs did here did not confer a significant benefit. For each and all of these reasons, the fee award to plaintiffs was not warranted.

---

[31] There appear to be only two instances where an action by the WRCB must be accompanied by supporting finding of facts. The first involves the procedures for imposing civil penalties for "minor violation[s]" of Porter-Cologne that are "warranted or required by federal law." (Wat. Code, § 13399.2, subd. (k)); the second involves the funding of projects in the Delta Tributary Watershed Program (*id.*, § 78647.10, subd. (a)).

[32] Plaintiffs rely on two instances where a fee award was upheld after a local governmental entity did not comply with the procedural requirements of the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) and the initial decision of the entity was reversed: *Bowman v. City of Berkeley* (2005) 131 Cal.App.4th 173 [31 Cal.Rptr.3d 447] and *Protect Our Water v. City of Merced* (2005) 130 Cal.App.4th 488 [30 Cal.Rptr.3d 202]. Plaintiffs mistakenly analogize to the proceedings here, asserting that "the record lacked analysis necessary to substantiate the [WRCB]'s vacated determination." Because there are no comparable procedural restraints attending the WRCB's nonadjudicatory decision here, these authorities are clearly distinguishable.

## DISPOSITION

In A124351, the judgment is affirmed. Respondents Board and PacifiCorp shall recover their costs of appeal.

In A124369 and A124370, the attorney fee order is reversed. Appellants Board and PacifiCorp shall recover their costs of appeal.

Haerle, Acting P. J., and Lambden, J., concurred.